## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:24-CV-25091

| |
|---|
| **CARDONE VENTURES, LLC, a Delaware limited liability company, and 10X HEALTH VENTURES LLC, a Delaware limited liability company,** |
| **Plaintiffs,** |
| **v.** |
| **IJS PRESENTATIONS, LLC, a Delaware limited liability company, GARY BRECKA, an individual, and ULTIMATE HUMAN, LLC, a Delaware limited liability company, CICELY S. ("SAGE") WORKINGER, an individual, and TURNING POINT HOLDINGS, LLC, a Florida limited liability company,** |
| **Defendants.** |

### <u>INTRODUCTION</u>

As the saying goes, you can't change someone's stripes.

Gary Brecka was a relatively unknown "biohacker" in a career littered with broken business relationships, personal bankruptcy, lawsuits, and tax liens, before receiving the opportunity of a lifetime: to have a nascent, underperforming strip-mall operation run by Brecka and his fiancée, Sage Workinger, serve as a component of a rising health and wellness juggernaut – 10X Health – engineered by Grant Cardone and Brandon Dawson. Incredibly successful entrepreneurs, best-selling authors, and social media influencers, Cardone and Dawson have successfully scaled, optimized, and created massive value in business through their "10X" growth teachings and strategies. They formed 10X Health with the single goal and vision of redefining wellness for millions of people around the world.

In a world where "10X" means to help struggling business owners scale their business and ideas to a point where they can create a life without limitations, 10X Health delivered in every sense of the word. Clientele, employees, Brecka's income, Brecka's social media following, revenues and profits all "10X'd." 10X Health and Cardone Ventures lifted Brecka and Workinger from obscurity. 10X Health and Cardone Ventures gave them the figurative and literal spotlight, and supplied the tools, resources, and expertise to build personas and social media presences with collectively millions of followers. In three short years, Brecka went from unbankable to self-proclaimed "celebrity biohacker." He and Workinger went from traveling commercial to flying on private jets, and from strip mall to a near $20 million penthouse. So transformative were the results that Brecka gushed in a June 2023 interview that business has "*absolutely exploded*," and "*Now I feel like I live somebody else's life*." The Money Mondays Podcast, March 3, 2023.

Brecka's old habits, however, proved impossible for him to resist. His character, punctuated by a penchant for self-aggrandizement and a willingness to sacrifice long-term growth and relationships for short-term personal benefit, soon revealed itself through a series of covert acts. Brecka opportunistically throttled his performance at 10X Health by, among other things:

- creating sham excuses about its products, plans, and leadership all while diverting business opportunities;

- siphoning business to his daughter Madison Brecka and her limited liability company to service 10X Health clientele and potential clientele;

- misappropriating and redirecting 10X Health resources, contacts, existing and prospective business partners, clientele, and potential clientele away from 10X Health;

- selling competing products under the "Ultimate Human" brand; and

- infringing upon a registered trademark owned by a medical doctor introduced to him by 10X Health.

Dawson and Cardone trusted allowing Brecka to be a face of 10X Health, and – because Brecka is not a medical doctor and does not hold any other form of medical professional license – supported him and the business by building a first-class medical team. The support grew thin, however, as 10X Health became increasingly aware of Brecka's self-serving agenda and suffered regular demands for additional compensation. However, no amount seemed large enough to satisfy Brecka's expanding appetite for personal exposure and personal wealth.

Ever the "Rule Brecka," as he has dubbed himself, Brecka's disdain for his fiduciary duties and the contracts he signed, and for the very support structure created for his success, forced 10X Health to terminate his services on November 5, 2024. 10X Health's numerous attempts to find common ground and business-oriented solutions proved fruitless against Brecka's personal agenda. As a result, 10X Health has been forced to file this lawsuit. For their deceit and betrayal, 10X Health and Cardone Ventures seek, among other things:

- a clawback of the tens of millions of dollars paid to Brecka and Workinger;

- an injunction against further unlawful competition by Brecka and Workinger in the anti-aging and wellness space;

- forfeiture of all profits made from unlawful use and exploitation of the "Ultimate Human" name;

- triple damages for Brecka's and Workinger's intentional infringement of Cardone Ventures' "Ultimate Human Analysis" trademark;

- an injunction against Brecka's and Workinger's use of the name "Ultimate Human"; and

- damages under the federal Lanham Act and Florida common law.

## **COMPLAINT**

Plaintiffs, Cardone Ventures, LLC ("Cardone Ventures") and 10X Health Ventures LLC ("10X Health") (Cardone Ventures and 10X Health, collectively, "Plaintiffs"), by and through the undersigned counsel, file this Complaint for Trademark Infringement, Unfair Competition, and

Cancellation of a Federal Trademark Registration against Defendants IJS Presentations, LLC ("IJS"), Gary Brecka ("Brecka"), and Ultimate Human, LLC ("Ultimate Human"), Cicely S. (Sage) Workinger ("Workinger"), and Turning Point Holdings, LLC ("Turning Point") (IJS, Brecka, Ultimate Human, Workinger, and Turning Point, collectively, "Defendants").  Plaintiffs further seek relief for IJS, Brecka, Turning Point, and Workinger's breaches of their respective Executive Services Agreements and 10X Health's operative policies, breaches of fiduciary duties, declaratory relief, and injunctive relief to prevent IJS, Brecka, Turning Point, and Workinger from competing directly against 10X Health and Cardone Ventures, in violation of their agreements.

## THE PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Cardone Ventures, LLC is a Delaware Limited Liability Company with its principal place of business located in Miami-Dade County, Florida. Cardone Ventures is the majority member and manager of 10X Health.

2.      Plaintiff 10X Health Ventures LLC is a Delaware Limited Liability Company with its principal place of business located in Miami-Dade County, Florida. As described in further detail below, 10X Health provides wellness services focused on enhancing human performance.

3.      Defendant IJS Presentations, LLC is a Delaware Limited Liability Company with its principal place of business located in Naples, Florida. Brecka is the manager of Defendant IJS Presentations, LLC.

4.      Defendant Gary Brecka is an adult citizen and resident of Florida.

5.      Defendant Ultimate Human, LLC is a Delaware Limited Liability Company with its principal place of business in Dover, Delaware.

6.      Defendant Cicely S. (Sage) Workinger is an adult citizen and resident of Florida.

7.     Defendant Turning Point Holdings, LLC is a Florida Limited Liability Company with its principal place of business in Naples, Florida. Workinger is the manager of Defendant Turning Point Holdings, LLC.

8.     This is an action for trademark infringement and unfair competition under the Federal Trademark Act of 1946, known as the Lanham Act, 15 U.S.C. § 1051, *et seq.*, cancellation of a federal trademark registration under 15 U.S.C. § 1064, trademark infringement and unfair competition under Florida common law, breach of Executive Services Agreements, breach of fiduciary duty, injunctive relief as to the Non-Competition Provision of the Executive Services Agreements, and declaratory relief.

9.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1338(a) and (b), because the claims address federal questions concerning the Lanham Act, 15 U.S.C. § 1121, trademark infringement of federally registered trademarks pursuant to 15 U.S.C. 1114, federal unfair competition pursuant to 15 U.S.C. § 1125(a), and cancellation of a federal trademark registration pursuant to 15 U.S.C. §§ 1064 and 1119.

10.     The Court has supplemental jurisdiction over the claims of 10X Health and Cardone Ventures arising under the laws of the State of Florida pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the claims of 10X Health and Cardone Ventures under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact.

11.     The Court has personal jurisdiction over Defendants consistent with the principles underlying the United States Constitution and the State of Florida because, among other things, Defendants are located and transact business in Florida. Specifically, Defendants maintain a place of business in this District, and serve clients and customers located in this District.  The Court

further has personal jurisdiction over Defendants because they have used their infringing trademarks in this District. In addition, the Court has personal jurisdiction over Defendants because they regularly transact business in Florida, regularly do or solicit business in Florida, contract to supply products in Florida, and derive substantial revenues from services rendered in Florida. Finally, IJS, Brecka, Workinger, and Turning Point consented to this Court's exercise of personal jurisdiction over them through the written agreements.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are located and transact business in Miami-Dade County, Florida, which is where a substantial part of the events or omissions giving rise to the claims occurred and are occurring. 10X Health and Cardone Ventures were also damaged in this District.  IJS, Brecka, Workinger, and Turning Point also consented to venue in this District through written agreements, which require that any disputes arising under the agreements be brought exclusively in a state or federal court of competent jurisdiction in Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### The Business of 10X Health and Its
### Super-Majority Owner Cardone Ventures

13.     Cardone Ventures is a business consultancy and investment management firm specializing in helping small and medium-sized businesses scale to achieve exponential growth. Healthcare is one of its many "verticals" in which Cardone Ventures actively invests. The founders of Cardone Ventures include Grant Cardone and Brandon Dawson, best-selling authors and renowned speakers on the topics of leadership, entrepreneurship, social media, and finance, who have successfully scaled, optimized, and created exponential growth for businesses. Brandon Dawson is the CEO of Cardone Ventures and 10X Health.

14.     10X Health was organized as a limited liability company as of September 16, 2021. Its initial members were Cardone Ventures, IJS Presentations, and Turning Point Holdings. At that time, Cardone Ventures owned 82% of the membership interests.

15.     Using a holistic approach, 10X Health's goal is to help clients take control of their health and give them the power to heal their bodies naturally, with no invasive surgeries. 10X Health wellness centers provide customized nutrient intravenous drip therapy; genetic testing; hormone optimization; blood testing; anti-aging aesthetic procedures (like redlight therapy and non-surgical cosmetic procedures); cold plunge pools; amino acid supplements; custom and precision supplements; nutraceuticals; cellular restoration; and other related services and products. 10X Health products are available at 10X Health-branded wellness centers, through licensees, and via e-commerce and popular platforms like Amazon.

**The Formation of 10X Health, and Its Acquisition of Streamline**

16.     Through an Asset Purchase Agreement dated September 16, 2021, 10X Health purchased (a) Streamline Medical Group Naples LLC and (b) Streamline Wellness, LLC; two limited liability companies owned by Workinger, Brecka's fiancée. The Asset Purchase Agreement included all of the sellers' right, title, and interest in the Streamline limited liability companies.

17.     Streamline opened in 2017, with Brecka acting as CEO and Workinger acting as CFO. Brecka and Workinger called themselves "anti-aging rejuvenation specialists." Streamline focused on fat loss, hormone optimization, and anti-aging. Located in a strip mall in Naples, Florida, Streamline's income peaked at less than $2.3 million in 2020, with just $297,058.16 in net income. In the year prior, Streamline enjoyed only $11,934.48 in net income.

18.     Brecka described himself, and continues to describe himself, as a human biologist and "biohacker." Brecka holds a BS in Biology from Frostburg State University and a BS in Human Biology from the National University of Health Sciences School of Chiropractic Medicine.

19.     Prior to his involvement in Streamline, Brecka had limited success in business, and no experience in the anti-aging and wellness industry. During the 20-year prior period, Brecka was a mortality-modeling expert for the insurance industry.

20.     Just a few years prior to forming Streamline, Brecka was the debtor in a Chapter 7 bankruptcy proceeding, in which he listed only $8,450 in personal property assets, $4,333 in monthly income, and over $3.4 million in liabilities.  Brecka's bankruptcy, combined with judgment creditor liens and a sizable federal tax lien, made it difficult if not impossible for him to own a business or obtain personal or conventional business financing. As a result, Workinger was the sole member and Manager of each Streamline entity involved in the 10X Health asset purchase. Brecka had no equity in either entity, and did not receive any portion of the cash purchase payment. However, as part of the asset purchase transaction, Brecka's entity IJS received 11,000 Class A membership units of 10X Health in exchange for his promises, among others, to contemporaneously enter into an Executive Services Agreement and to help build the 10X Health business.

21.     In or about 2019, Brecka and Streamline came to the attention of Grant Cardone, one of the principals of Cardone Ventures. Grant Cardone referred business from the 10X community to Brecka and Streamline. However, Brecka and Streamline proved wholly inadequate to manage a growing business.

22.     In the wake of being given the spotlight in front of approximately 34,000 attendees at a 2019 Grant Cardone 10X Growth Conference, Brecka and Streamline were unable to deliver

any products or services to 3,800 people who wanted to work with them. As a result of this catastrophic failure, Grant Cardone discontinued plans to work further with them. Discussions only resumed more than a year later when Brandon Dawson and Cardone Ventures entered the picture and began to slowly refer business to them. When Cardone Ventures eventually agreed to form 10X Health, purchase Streamline's assets, and give Brecka and Workinger roles in the new entity, Cardone Ventures only did so after Brecka and Workinger acquiesced to sign executive services agreements and to Cardone Ventures being Manager and super-majority owner of 10X Health.

23.     In 2022, 10X Health acquired HealthGains to provide a larger platform for patient centric care. The HealthGains acquisition provided 10X Health, Brecka, and Workinger with the opportunity to provide additional services to clients and potential clients.

24.     10X Health's acquisition and subsequent operation of Streamline, with Cardone Ventures as Manager, proved transformational. The business has rapidly expanded in both clientele and revenue, with positive exposure on television and social media and through A-list celebrities and professional athletes. In the 14 months after the Streamline acquisition, the business grew from 8 to 80 employees and to $27M in revenue. As Brecka admitted after that initial fast-growth period, he felt "like I live somebody else's life." For 2024, 10X Health is expected to enjoy approximately $120 million in annual revenue, supported by over 100 employees.

25.     Through its association with 10X Health and its principals, Brecka has been able to work with clients ranging from CEOs to celebrities and professional athletes. Brecka is also now invited to speak at major health and wellness conferences around the world. In January 2024, Brecka promoted himself to be of "world-renown and effectively is a celebrity in the health and wellness space, with an online audience of millions of persons. Brecka's personal social media accounts, and those associated with the Podcast, total over 3.3 million followers across Facebook,

Instagram, TikTok, YouTube, and X." With the millions earned from 10X Health, likely along with other sums garnered from unauthorized side deals and similar endeavors, Brecka and Workinger purchased a penthouse in the Miami suburb of Coconut Grove on August 14, 2024 for $19.5 million.

26.     As demonstrated by the millions of dollars Brecka has made in the past few years, without the support of 10X Health, Cardone Ventures, Grant Cardone and Brandon Dawson, Brecka's current success and income would not have been possible. For some reason, this support and ensuing success was not enough for Brecka. Despite only netting a few hundred thousand dollars a year prior being engaged by 10X Health and incentivized with equity, once Brecka gained his financial footing and attained a following, he surreptitiously engaged in a scheme to set up competing entities, siphon off business, and use the company's time, assets, personnel, and relationships, for personal profit.

**Brecka's Executive Services Agreement**

27.     As part of the Asset Purchase Agreement to acquire the Streamline limited liability companies, 10X Health entered into an Executive Services Agreement with Brecka.

28.     The original Executive Services Agreement was subsequently amended and restated. The operative Second Amended and Restated Executive Services Agreement (the "Brecka Agreement") took effect on August 17, 2023. The Brecka Agreement is **Exhibit 1**.

29.     The Brecka Agreement outlines the substantial compensation paid by 10X Health in exchange for services performed and agreements made by IJS and Brecka.

30.     Under the Brecka Agreement, Brecka was appointed as Executive Vice President – Chief Human Biologist and directly reported to 10X Health's CEO, Brandon Dawson. Ex. 1, §1.1. This role required IJS and Brecka to "devote substantially all of their time to [10X Health] and to

fulfilling the duties assigned to them hereunder." Ex. 1, §1.2. The Brecka Agreement further required IJS and Brecka to "materially abide by [10X Health's] policies, practices, procedures, and rules of which they are notified" to the extent they are not inconsistent with the Brecka Agreement. Ex. 1, §1.2.1.

31.     Another crucial part of the Brecka Agreement required IJS and Brecka, subject to some express, limited exceptions, not to "engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the CEO." Ex. 1, §1.2.2.

32.     The Brecka Agreement was for an initial term that expired on September 15, 2024.

33.     Following an at-will period, 10X Health terminated the Brecka Agreement by letter dated November 5, 2024. The November 5, 2024 letter is **Exhibit 2**.

34.     10X Health terminated the Brecka Agreement as a result of the "substantial loss of trust between the parties, including the repeated concerns that [10X Health] has conveyed to [Brecka] about [Brecka's] self-dealing, competitive activity, misappropriation of intellectual property, and [10X Health] assets, dishonesty, and other misconduct." *Id.*

35.     Through the Brecka Agreement, Brecka and IJS agreed to a Non-Competition Provision. *See* Ex. 1, §4.2. The Non-Competition Provision broadly provides that IJS and Brecka shall not, during the Term of the Agreement, and for a two-year period following the termination of the Agreement (the "Restricted Period"), participate in a Competing Business. *Id.* A Competing Business is broadly defined as any entity that competes with 10X Health or any Affiliates, including Cardone Ventures, in the following products or services anywhere in the United States:

(i)     consulting services to any person or entity that provides, offers, or develops anti-aging, hormone therapy, human rejuvenation, or cosmetic services that are the same as or similar to services offered by Company or in development

by Company during the Term as reflected in Company's contemporaneous documents and materials;

(ii)     the manufacture or supply of anti-aging, hormone therapy, or cosmetic products; or

(iii)    any anti-aging, hormone therapy, vitamin supplement, or rejuvenation products or services that are the same as or similar to products and services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials.

*Id.*

36.     While he was affiliated with 10X Health, however, Brecka ignored these contractual obligations and formed Ultimate Human, LLC, a company directly competing with 10X Health and Cardone Ventures in the wellness space.

37.     In further violation of the Brecka Agreement, Brecka used 10X Health staff and other resources to form Ultimate Human, LLC and to launch and promote the brand, The Ultimate Human.

38.     Brecka describes The Ultimate Human as follows, using similar language that 10X Health uses to describe its business:

At The Ultimate Human, we're dedicated to empowering individuals on their journey to peak health and wellness. Our brand stands at the intersection of science and well-being, offering insights and products that are grounded in rigorous research yet tailored for your everyday life. From innovative health tools to educational resources, we're committed to providing you with the knowledge and products you need to unlock your full potential.

https://www.theultimatehuman.com/about (accessed December 23, 2024).

39.     Brecka has dubbed himself, and paid subscribers who participate in his Ultimate Human community, the "Rule Breckas." The "Rule Brecka" community is an exclusive membership program designed to help members allegedly unlock their "ultimate potential in all areas of health and wellness."



https://www.theultimatehuman.com/ (accessed December 23, 2024).

40.     The Ultimate Human website additionally contains a Shop in which Ultimate Human merchandise, mouth tape, protein bars, and strength training products are sold.

41.     The Shop additionally contains recommendations for additional products and links to partners which sell a wide range of wellness products, including products in the field of anti-aging.

42.     During the term of the Brecka Agreement and the Restricted Period, Brecka has violated the Non-Competition Provision by selling and promoting competitive products including vitamins and supplements, and promoting Competing Businesses such as BodyHealth, Cold Life Plunge Pool, and Echo Water. Each of these businesses claims to offer anti-aging or wellness-related products. For instance, BodyHealth claims that its products can "unlock the aging process." https://bodyhealth.com/blogs/news/unlocking-the-aging-process (accessed December 23, 2024).

43.     Cold Life's Instagram page prominently depicts a photo of Brecka and its cold plunge pool, while claiming that it elevates "wellness."



https://www.instagram.com/thecoldlife/ (accessed December 23, 2024).

44.     Echo Water similarly lays claim to supporting wellness, and that its product is the "only hydrogen water bottle used by Gary Brecka."



https://echowater.com/ (accessed December 23, 2024).

45.      Brecka has further used 10X Health customer data, insights, and intellectual property without authorization or attribution for his personal benefit. He has siphoned off business of 10X Health by introducing and requiring his daughter, Madison Brecka, to service clientele and potential clientele through her entity known as Brecka Wellness, LLC. As set forth in an April 23, 2024 USPTO trademark application by Brecka Wellness, its goods and services include intravenous hydration therapy services, intravenous vitamin therapy services, and concierge medicine services. These goods and services directly compete with goods and services offered by 10X Health. It is believed that Brecka financially benefits from the referral of clients to Brecka Wellness.

46.      As a result of IJS and Brecka's actions, 10X Health and Cardone Ventures have been irreparably damaged.

/

/

**Workinger's Executive Services Agreement**

47.     As part of the Asset Purchase Agreement to acquire the Streamline limited liability companies, 10X Health entered into an Executive Services Agreement with Workinger.

48.     The original Executive Services Agreement was subsequently amended and restated. The operative First Amended and Restated Executive Services Agreement (the "Workinger Agreement") took effect on August 18, 2023. The Workinger Agreement is **Exhibit 3**.

49.     The Workinger Agreement outlines the substantial compensation paid by 10X Health in exchange for services performed and agreements made by Turning Point and Workinger.

50.     Under the Workinger Agreement, Workinger was appointed as Vice President – Director of Operations and directly reported to 10X Health's CEO, Brandon Dawson. Ex. 3, §1.1. Like the Brecka Agreement, the Workinger Agreement and the roles designated to Turning Point and Workinger required Turning Point and Workinger to "devote substantially all of their time to [10X Health] and to fulfilling the duties assigned to them hereunder." Ex. 3, §1.2. The Workinger Agreement further required Turning Point and Workinger to "materially abide by [10X Health's] policies, practices, procedures, and rules of which they are notified" to the extent they are not inconsistent with the Workinger Agreement. Ex. 3, §1.2.1.

51.     Another crucial part of the Workinger Agreement required Turning Point and Workinger, subject to some express, limited exceptions, not to "engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the CEO." Ex. 3, §1.2.2.

52.     The Workinger Agreement was for an initial term that expired on September 15, 2024.

53.     Following an at-will period, 10X Health terminated the Workinger Agreement by letter dated November 5, 2024. The November 5, 2024 letter is **Exhibit 4**.

54.     Through the Workinger Agreement, Turning Point and Workinger agreed to a Non-Competition Provision. *See* Ex. 3, §4.2. The Non-Competition Provision broadly provides that Turning Point and Workinger shall not, during the Term of the Agreement, and for a one-year period following the termination of the Agreement (the "Restricted Period"), participate in a Competing Business. *Id.* A Competing Business is broadly defined as any entity that competes with 10X Health or any Affiliates, including Cardone Ventures, in the following products or services anywhere in the United States:

(i)     consulting services to any person or entity that provides, offers, or develops anti-aging, hormone therapy, human rejuvenation, or cosmetic services that are the same as or similar to services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials;

(ii)    the manufacture or supply of anti-aging, hormone therapy, or cosmetic products; or

(iii)   any anti-aging, hormone therapy, vitamin supplement, or rejuvenation products or services that are the same as or similar to products and services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials.

*Id.*

55.     While she was affiliated with 10X Health, however, Workinger ignored these contractual obligations and participated with Brecka in Ultimate Human, LLC, a company directly competing with 10X Health and Cardone Ventures in the wellness space.

56.     Workinger has worked side-by-side with Brecka on Ultimate Human.

57.    Workinger has appeared at Ultimate Human events (including product launches), appeared on podcasts on Ultimate Human's behalf, participated in Ultimate Human's business activities, and has otherwise been intimately involved with Ultimate Human.

58.    As a result of Turning Point and Workinger's actions, 10X Health and Cardone Ventures have been irreparably damaged.

## PLAINTIFFS' VALUABLE RIGHTS

59.    Cardone Ventures is a business consulting company launched in March 2019 that helps business owners grow their companies from a 360-degree perspective, including operations, marketing, finance, and people.

60.    Cardone Ventures is the owner of the trademark ULTIMATE HUMAN ANALYSIS ("ULTIMATE HUMAN ANALYSIS Mark"), which it uses in connection with health care services, namely, wellness programs, concierge anti-aging and performance improvement medical practice, and executive physical programs (collectively, "Plaintiffs' Services"). Cardone Ventures, including through its predecessor-in-interest and licensee, has continuously used in interstate commerce the well-known and distinctive ULTIMATE HUMAN ANALYSIS Mark since at least as early as September 2020.

61.    Cardone Ventures has duly and properly registered the ULTIMATE HUMAN ANALYSIS Mark in the United States Patent and Trademark Office ("USPTO") on the Principal Register.

62.    Cardone Ventures is the owner of U.S. Trademark Registration No. 6605260 for the mark ULTIMATE HUMAN ANALYSIS for "health care services, namely, wellness programs" in Class 44, which issued on January 4, 2022 at the USPTO, the underlying application having been filed on October 5, 2020, with a claimed date of first use and first use in commerce

of September 1, 2020 ("Registration").   A true and correct copy of United States Trademark Registration No. 6605260 and assignment is attached as **Exhibit 5**.

63.     Through an Intellectual Property Assignment and License Agreement in March 2024, Cardone Ventures as assignee acquired all right, title, and interest in and to the ULTIMATE HUMAN ANALYSIS Mark, including the Registration and related intellectual property in ULTIMATE HUMAN ANALYSIS Mark (collectively, the "ULTIMATE HUMAN ANALYSIS Marks"), together with the goodwill and together with all causes of action for any and all previously occurring infringements of the rights being assigned and the right to receive and retain the proceeds relating to those infringements.

64.     Cardone Ventures has all the rights, benefits, and interests of its predecessor in connection with and arising out of the ULTIMATE HUMAN ANALYSIS Marks, including all intellectual property rights therein.

65.     The Registration is valid and subsisting and provides conclusive evidence of the right of Cardone Ventures to use the ULTIMATE HUMAN ANALYSIS Marks in commerce.

66.     The ULTIMATE HUMAN ANALYSIS Marks clearly establish that Cardone Ventures has senior trademark rights in the ULTIMATE HUMAN ANALYSIS Marks and consequently there is no question of priority of rights, as such priority clearly belongs to Cardone Ventures.

67.     Cardone Ventures, including through its predecessor-in-interest and licensee, has extensively used the ULTIMATE HUMAN ANALYSIS Marks and has advertised, promoted, and offered the Plaintiffs' Services under the ULTIMATE HUMAN ANALYSIS Marks in interstate commerce through various channels of trade.   As a result, the customers and potential customers of Cardone Ventures, and the public in general have come to know and recognize the ULTIMATE

HUMAN ANALYSIS Marks as identifying the Plaintiffs' Services as services of the highest quality offered by Cardone Ventures and to associate the ULTIMATE HUMAN ANALYSIS Marks with the Plaintiffs' Services.  Plaintiff has, thus, built up extensive and invaluable goodwill in connection with the sale of goods and services under the ULTIMATE HUMAN ANALYSIS Marks.

68.     Cardone Ventures, including through its predecessor-in-interest and licensee, has used the ULTIMATE HUMAN ANALYSIS Marks for over four years, and has invested significant amounts of time, money, and effort in advertising and promoting the ULTIMATE HUMAN ANALYSIS Marks.   The Plaintiffs' Services under the ULTIMATE HUMAN ANALYSIS Marks have been extensively advertised, including on the website at the domain name <blindspotmedical.com>.  A true and correct copy of screenshots from this website are below and printouts from the website are attached as **Exhibit 6.**









### STEP 1: BOOK A CALL WITH US

Book a call with us *immediately* so we can connect and see if The Ultimate Human Analysis is the next best step for your health.

Dr. Boyd is extremely selective about who he works with... and wants to make sure that **you are committed to creating lasting change for optimized health.**

69.     Cardone Ventures' licensee promotes Plaintiffs' Services under the ULTIMATE

HUMAN ANALYSIS Marks through an active social media presence on Instagram and Threads

(@davidboydmd), Facebook (BlindspotMedical), and YouTube (@davidboydmd).   A true and

correct copy of screenshots from the Instagram, Threads, and Facebook accounts are below and

printouts from the Instagram, Threads, Facebook, and YouTube accounts are attached as **Exhibit**

**7**.





70.    Cardone Ventures' licensee also promotes Plaintiffs' Services under the ULTIMATE HUMAN ANALYSIS Marks through podcasts, including Beyond the Limit with Tyler Williams.  A true and correct copy of a screenshot from this podcast is below and a printout from this podcast is attached as **Exhibit 8**.



71.     As a result of at least the aforementioned activities of Cardone Ventures' predecessor-in-interest and licensee, the ULTIMATE HUMAN ANALYSIS Marks have become strong and distinctive source identifiers for Plaintiff, including since long before Defendants began engaging in the complained of conduct in this Complaint.

72.     In addition to Cardone Ventures' licensee, Cardone Ventures has other concrete plans and intentions to use ULTIMATE HUMAN ANALYSIS Marks for Plaintiffs' Services, including but not limited to optimizing the health and wellness of Plaintiffs' clients by means of its 10X precision genetic analysis, precision supplements, precision weight management, precision intravenous therapies, amino acid supplements, and more.

**DEFENDANTS' WRONGFUL CONDUCT**

73.     Notwithstanding Cardone Ventures' exclusive and prior rights in and to the ULTIMATE HUMAN ANALYSIS Marks, and well after 2020, Defendants started using the identical or substantially indistinguishable marks ULTIMATE HUMAN, THE ULTIMATE HUMAN, and variations thereof (collectively, "Infringing Marks"), where they advertise, promote, and offer the identical and nearly identical goods and services to Plaintiffs' Services ("Infringing Goods & Services").

74.     Prior to Cardone Ventures' filing of the Complaint in this action, Cardone Ventures made good faith efforts to resolve this matter amicably with Defendants.  Nevertheless, as has become readily apparent, Defendants had no intentions of resolving this matter amicably, but instead appear to be moving forward with growing their business under the Infringing Marks. As a result, Cardone Ventures has had no choice but to commence this action.

75.     Defendants use and intend to use the Infringing Marks without the permission and authorization of Cardone Ventures, thereby confusing consumers as to the source of the goods and

services and resulting in damage and detriment to Cardone Ventures and its reputation and goodwill.

76.     Consumers are likely to believe mistakenly that Defendants are affiliated or connected with, or otherwise authorized or sponsored by Cardone Ventures.  Thus, Defendants' misleading conduct is likely to harm consumers.

77.     Defendants' use of the Infringing Marks is identical and confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks in appearance, sound, meaning, and commercial impression.

78.     Defendants' use of the Infringing Marks trades off the goodwill of the ULTIMATE HUMAN ANALYSIS Marks and is without permission or license from Cardone Ventures.

79.     Defendants advertise the Infringing Goods & Services in commerce using the Infringing Marks, which are identical to or confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks.  Both Cardone Ventures and Defendants utilize the same or similar channels of trade.

80.     Defendants' use of the Infringing Marks has misled and is likely to continue to mislead consumers as to the source, sponsorship, affiliation, or association of the Infringing Goods & Services, causing consumers and potential consumers to assume erroneously that the Infringing Goods & Services under the Infringing Marks are provided by or otherwise sponsored, affiliated, or associated with Cardone Ventures when in fact they are not.

81.     Upon information and belief, Defendants' infringement has created, and Defendants have subsequently profited from, actual consumer confusion.

82.     Brecka was an executive of Cardone Ventures' subsidiary, 10X Health, at the time Defendants started using the Infringing Marks.

83.     In or around October 2023, Brecka started using the domain name <the ultimatehuman.com>.  In or around December 2023, counsel for Plaintiffs corresponded in writing with counsel for Defendants regarding this use, among other things.  Counsel for Brecka claimed at that time that the website at that domain name was being used to promote 10X Health's products.

84.     Unbeknownst to Plaintiffs at that time, Brecka had caused to be filed in the name of Ultimate Human, LLC, a Delaware limited liability company, a federal trademark application for ULTIMATE HUMAN for "entertainment services, namely, providing audio and video podcasts in the field of longevity and anti-aging" in Class 41, on October 27, 2023 at the USPTO, with a claimed date of first use of October 17, 2023.  This application was assigned Serial No. 98243495, and the registration issued on October 1, 2024 as Registration No. 7522205.  A true and correct copy of this United States Trademark Registration No. 7522205 is attached hereto as **Exhibit 9**.

85.     Plaintiffs have recently learned that Defendants, namely Ultimate Human and Brecka, have subsequently caused to be filed several more federal trademark applications for the Infringing Marks, including on March 13, 2024 for ULTIMATE HUMAN, Serial No. 98446729, THE ULTIMATE BIOHACKER, Serial No. 98446831, and ULTIMATE HOME, Serial No. 98447105; on June 3, 2024 for ULTIMATE HUMAN PROTOCOL, Serial No. 98581097, and ULTIMATE ATHLETE INSTITUTE, Serial No. 98581099; on July 9, 2024 for THE ULTIMATE HUMAN, Serial No. 98638497; and on July 29, 2024 for THE ULTIMATE HUMAN AMINOS, Serial No. 98670744, and THE ULTIMATE HUMAN COMPLETE AMINOS, Serial No. 98670752 (collectively, "Infringing Applications").  A true and correct copy of printouts from the USPTO Trademark Status and Document and Retrieval webpage of U.S. Application Serial Nos. 98446729, 98446831, 98447105, 98581097, 98581099, 98638497, 98670744, and 98670752 is

attached as **Exhibit 10**.  The Infringing Applications were filed in connection with a host of health and wellness goods and services, including dietary and nutritional supplements, entertainment services relating to same, and related goods and services (collectively, and hereinafter together with the Infringing Goods & Services already defined above, the "Infringing Goods & Services").

86.     The USPTO has issued Office Actions against several of the Infringing Applications, refusing registration to the ULTIMATE HUMAN Mark, U.S. Application Serial No. 98446729 on the grounds of prior marks, namely, Cardone Ventures' Registration.

87.     As an executive of Plaintiffs, Brecka had access to Plaintiffs' proprietary information, including marketing plans and marketing materials, financial information, and vendor and supplier names, and other proprietary information kept by Plaintiffs in the ordinary course of their business.

88.     As part of his role at Plaintiffs, Brecka was familiar with Cardone Ventures' proprietary information and how it did business.

89.     Indeed, Brecka's role at 10X Health overlapped with Cardone Ventures' predecessor-in-interest to the ULTIMATE HUMAN ANALYSIS Marks. Brecka was familiar with Dr. David Boyd (Cardone Ventures' predecessor-in-interest and licensee of the ULTIMATE HUMAN ANALYSIS Marks) prior to Defendants' commencing any use of the Infringing Marks. Not only did Brecka know Dr. Boyd, but also he had actual knowledge of the ULTIMATE HUMAN ANALYSIS Marks. Brecka knew or would have known of the predecessor-in-interest's use of the ULTIMATE HUMAN ANALYSIS Marks prior to Defendants' commencing any use of the Infringing Marks.

90.     According to the records of the Delaware Secretary of State, Ultimate Human, LLC was formed on August 11, 2023.  A true and correct copy of a printout from the Delaware Secretary of State's website showing the status of Ultimate Human is attached as **Exhibit 11**.

91.     To promote their Infringing Goods & Services, Defendants operate a website at the domain name <theultimatehuman.com>.  A true and correct copy of screenshots from this website are below and printouts from the website are attached as **Exhibit 12**.





 YouTube      Apple Podcasts      Spotify

## The Ultimate Human Podcast

For over 20 years, Gary Brecka worked in the life insurance industry predicting mortality. If he got 5 years of medical records and 5 years of demographic data on you, the team that he was associated with could tell a life insurance company how long you had to live to the month. After years and years of doing this type of research and analysis, he decided he wanted to spend the balance of his lifetime helping people live happier, healthier, longer, more fulfilling lives. With this mission in mind, he created The Ultimate Human podcast.



ABOUT    ASK GARY    PODCAST    SHOP ⌃    NEWS    CONTACT



**THE ULTIMATE HUMAN**

UH Merch  NEW

UH Mouth Tape

UH Protein Bars  NEW

UH Strength Training

**RECOMMENDED**

Alkamind

Glutaryl

Kettle & Fire

Nutri-Tech Air Purifier

Gary's Amazon Store

BROWSE ALL →

**PARTNERS**

Baja Gold Salt Co
10 OFF CODE: ULTIMATE10

BodyHealth
10% OFF CODE: ULTIMATE10

Cold Life

Echo Water

Eight Sleep

Masa Chips
20% OFF CODE: ULTIMATE20

Once Upon a Coconut
10% OFF CODE: ULTIMATE10

Parker Pastures

Vandy Crisps
20% OFF CODE: ULTIMATE20

**FEATURED**

**The Ultimate Human Protein Bars**
A convenient, quick, easy, delicious, and nutritious snack that provides clean-burning energy and a boost of nutrients your body needs to be at peak performance.

GET YOURS!



AVAILABLE NOW

## The Ultimate Human Protein Bars

Stay fueled and focused with the all-new Ultimate Human Protein Bar—a delicious, nutrient-packed snack designed for anyone on the go. Perfect for busy professionals, athletes, and active parents alike, this bar brings clean energy to keep you performing at your peak.

GET YOURS NOW  →

31



The Ultimate Human Unisex Tank

$30.00



The Ultimate Human Unisex T-Shirt

$30.00



The Ultimate Human Unisex Long-Sleeve Tee

$35.00



The Ultimate Human Trucker Cap

$35.00



The Ultimate Human Snapback Cap

$35.00



The Ultimate Human Unisex Jogger

$45.00

STRENGTH TRAINING

# The Ultimate Human Strength Training Equipment

Discover the pinnacle of strength training with our elite line of equipment, designed for unmatched versatility and durability. Ideal for both home gyms and professional settings, this collection helps you achieve peak fitness and transform your workout experience.

SHOP STRENGTH TRAINING ⟶







92.    Defendants also promote the Infringing Goods & Services under the Infringing Marks on social media on Instagram (@ultimatehumanpod), Facebook (ultimatehuman), and YouTube (@ultimatehumanpodcast).  A true and correct copy of screenshots from the Instagram, Facebook, and YouTube accounts are below and printouts from the Instagram, YouTube, and Facebook accounts are attached as **Exhibit 13**.



**ultimatehumanpod**  Follow   Message

**206** posts   **385K** followers   **2** following

**The Ultimate Human Podcast**
🎙️ The Official Instagram for The Ultimate Human Podcast
🎙️ Hosted by @garybrecka
🔗 link.me/garybrecka + 1

▤ POSTS    ◎ REELS    ⊙ TAGGED









**Ultimate Human Podcast with Gary Brecka** ●
@ultimatehumanpodcast · 314K subscribers · 470 videos
Gary Brecka is a Human Biologist, biohacker, researcher, and an anti-aging and longevity ... ...**more**
link.me/garybrecka and **4 more links**

Subscribe

Home   Videos   Shorts   Live   Podcasts   Playlists   Community   ⌕

Latest   Popular   Oldest






Stress Your Way to Better Health with    Dr. Matt Cook: Reversing Age with Peptides,    Q&A with Gary Brecka: Exposing Truth About    Devon Lévesque: What Facing Death on Mt.



93.     Defendants further promote the Infringing Marks through co-marketing and co-branding endeavors, including with Cold Life and BodyHealth.   A true and correct copy of a screenshot from the Cold Life website is below and printouts from the website are attached as **Exhibit 14.**



35



94.     A true and correct copy of a screenshot from the BodyHealth website is below and printouts from the website are attached as **Exhibit 15.**



95.     All of the aforementioned acts of Defendants were directed and authorized by Brecka.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement – 15 U.S.C. § 1114**

96.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

97.     Defendants' Infringing Marks are identical to or substantially indistinguishable from the ULTIMATE HUMAN ANALYSIS Marks in appearance, sound, meaning, and commercial impression that the use and registration thereof is likely to cause confusion, mistake, and deception as to the source or origin of Infringing Goods & Services, and will injure and damage Cardone Ventures and the goodwill and reputation symbolized by the ULTIMATE HUMAN ANALYSIS Marks.

98.     The Infringing Goods & Services offered under the Infringing Marks are identical or so related to the services offered under the ULTIMATE HUMAN ANALYSIS Marks by Cardone Ventures that the public is likely to be confused, deceived, and to assume erroneously that the Infringing Goods & Services are those of Cardone Ventures or that Defendants are in some way connected with, licensed, or sponsored by or affiliated with Cardone Ventures, all to Cardone Ventures' irreparable damage.

99.     Likelihood of confusion is enhanced by the fact that the ULTIMATE HUMAN ANALYSIS Marks are strong, well-known, and entitled to a broad scope of protection.

100.    Likelihood of confusion is also enhanced by the fact that Defendants' Infringing Marks are visually and phonetically identical or substantially indistinguishable from the ULTIMATE HUMAN ANALYSIS Marks, and Infringing Goods & Services are identical or closely related to the Plaintiffs' Services.

101.    Likelihood of confusion is further enhanced by the fact that Defendants' Infringing Marks and the ULTIMATE HUMAN ANALYSIS Mark both prominently incorporate the identical, key components "ULTIMATE HUMAN" and "ULTIMATE," Defendants' Infringing Marks are wholly encompassed by the ULTIMATE HUMAN ANALYSIS Marks, and the Infringing Goods & Services are identical or closely related to the Plaintiffs' Services. Specifically, the Infringing Marks have the same dominant components ULTIMATE HUMAN and ULTIMATE and for the same or closely related goods and services.

102.    Likelihood of confusion is even further enhanced by the fact that Cardone Ventures and Defendants market and will likely market their services in the same or similar channels of trade. Defendants use the Infringing Marks on their website, social media, and in other manners typical in the trade in connection with offering and rendering the Infringing Goods & Services.

103.     Defendants are not affiliated or associated with Cardone Ventures and have not been endorsed or sponsored by Cardone Ventures, nor has Cardone Ventures approved any of the Infringing Goods & Services offered, sold, or provided or intended to be offered, sold, or provided by Defendants under the Infringing Marks.

104.     Defendants have never sought or obtained the permission of Cardone Ventures to use the Infringing Marks, nor has Cardone Ventures approved any of the Infringing Goods & Services offered under the Infringing Marks.

105.     By advertising, promoting, marketing, offering, and providing the Infringing Goods & Services under the Infringing Marks, Defendants have used the Infringing Marks in commerce.

106.     Defendants' use of the Infringing Marks in connection with Infringing Goods & Services is likely to cause confusion, mistake, or deception of consumers as to the source of origin or sponsorship of the services, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1114.

107.     Defendants' use of the Infringing Marks constitutes trademark infringement, which is likely to deceive customers and prospective customers into believing that the Infringing Goods & Services offered for sale under the Infringing Marks are those of Cardone Ventures in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

108.     Consumers are likely to purchase or engage the Infringing Goods & Services being offered under the Infringing Marks believing them to be those of Cardone Ventures, thereby resulting in a loss of goodwill and economic harm to Cardone Ventures.

109.     Defendants' provision of the Infringing Goods & Services under the Infringing Marks has caused, and is likely to continue to cause, confusion, mistake, or deception as to the

origin of the Infringing Goods & Services and to convey falsely that the Infringing Goods & Services originate from or are endorsed or authorized by Cardone Ventures, or that the services are otherwise affiliated with Cardone Ventures, when such is not the case.

110.     Cardone Ventures is informed and believes, and on that basis, alleges that Defendants have derived unlawful gains and profits from their infringing use of the Infringing Marks.

111.     The goodwill of Cardone Ventures' business under the ULTIMATE HUMAN ANALYSIS Marks is of great value, and Cardone Ventures will suffer irreparable harm should Defendants' trademark infringement be allowed to continue to the detriment of the trade reputation and goodwill of Cardone Ventures for which damage Cardone Ventures cannot be adequately compensated at law.

112.     Cardone Ventures has no control over the nature and quality of the goods and services offered by Defendants under the Infringing Marks. Any failure, neglect, or default of Defendants in providing the Infringing Goods & Services will reflect adversely on Cardone Ventures. Thus, the value of the ULTIMATE HUMAN ANALYSIS Marks is subject to damage by an entity Cardone Ventures cannot control.

113.     Unless enjoined by this Court from so doing, Defendants will continue to engage in their acts of trademark infringement, unfair competition, and false representation and designations, to the irreparable damage and injury of Cardone Ventures.

114.     Cardone Ventures has no adequate remedy at law.

115.     Upon information and belief, Defendants have engaged in acts of trademark infringement, with knowledge of Cardone Ventures' exclusive rights in and to the ULTIMATE HUMAN ANALYSIS Marks in connection with the Plaintiffs' Services, and Defendants continue

in such acts of intentional trademark infringement, thus entitling Cardone Ventures to an award of treble its actual damages or Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

**SECOND CLAIM FOR RELIEF**
**Federal Unfair Competition and False Designation of Origin and**
**False and Misleading Representations – 15 U.S.C. § 1125(a)**

116.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

117.    Defendants' Infringing Marks are identical to or substantially indistinguishable from the ULTIMATE HUMAN ANALYSIS Marks in appearance, sound, meaning, and commercial impression that the use and registration thereof is likely to cause confusion, mistake, and deception as to the source or origin of Infringing Goods & Services, and will injure and damage Cardone Ventures and the goodwill and reputation symbolized by the ULTIMATE HUMAN ANALYSIS Marks.

118.    The Infringing Goods & Services offered under the Infringing Marks are identical or so related to the services offered under the ULTIMATE HUMAN ANALYSIS Marks by Cardone Ventures that the public is likely to be confused, deceived, and to assume erroneously that the Infringing Goods & Services are those of Cardone Ventures or that Defendants are in some way connected with, licensed, or sponsored by or affiliated with Cardone Ventures, all to Cardone Ventures' irreparable damage.

119.    Likelihood of confusion is enhanced by the fact that the ULTIMATE HUMAN ANALYSIS Marks are strong, well-known, and entitled to a broad scope of protection.

120.    Likelihood of confusion is also enhanced by the fact that Defendants' Infringing Marks are visually and phonetically identical or substantially indistinguishable from the

ULTIMATE HUMAN ANALYSIS Marks, and Infringing Goods & Services are identical or closely related to the Plaintiffs' Services.

121. Likelihood of confusion is further enhanced by the fact that Defendants' Infringing Marks and the ULTIMATE HUMAN ANALYSIS Mark both prominently incorporate the identical, key components "ULTIMATE HUMAN" and "ULTIMATE," Defendants' Infringing Marks are wholly encompassed by the ULTIMATE HUMAN ANALYSIS Marks, and the Infringing Goods & Services are identical or closely related to the Plaintiffs' Services. Specifically, the Infringing Marks have the same dominant components ULTIMATE HUMAN and ULTIMATE and for the same or closely related goods and services.

122. Likelihood of confusion is even further enhanced by the fact that Cardone Ventures and Defendants market and will likely market their services in the same or similar channels of trade. Defendants use the Infringing Marks on their website, social media, and in other manners typical in the trade in connection with offering and rendering the Infringing Goods & Services.

123. Defendants are not affiliated or associated with Cardone Ventures and have not been endorsed or sponsored by Cardone Ventures, nor has Cardone Ventures approved any of the Infringing Goods & Services offered, sold, or provided or intended to be offered, sold, or provided by Defendants under the Infringing Marks.

124. Defendants have never sought or obtained the permission of Cardone Ventures to use the Infringing Marks, nor has Cardone Ventures approved any of the Infringing Goods & Services offered under the Infringing Marks.

125. By advertising, promoting, marketing, offering, and providing the Infringing Goods & Services under the Infringing Marks, Defendants have used the Infringing Marks in commerce.

126.   Defendants' use of the Infringing Marks in connection with Infringing Goods & Services is likely to cause confusion, mistake, or deception of consumers as to the source of origin or sponsorship of the services, in violation of the Lanham Act, including but not limited to 15 U.S.C. § 1125(a).

127.   Defendants' use of the Infringing Marks constitutes unfair competition and a false designation of origin or false or misleading description or representation of fact, which is likely to deceive customers and prospective customers into believing that the Infringing Goods & Services offered for sale under the Infringing Marks are those of Cardone Ventures in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

128.   Consumers are likely to purchase or engage the Infringing Goods & Services being offered under the Infringing Marks believing them to be those of Cardone Ventures, thereby resulting in a loss of goodwill and economic harm to Cardone Ventures.

129.   Defendants' provision of the Infringing Goods & Services under the Infringing Marks has caused, and is likely to continue to cause, confusion, mistake, or deception as to the origin of the Infringing Goods & Services and to convey falsely that the Infringing Goods & Services originate from or are endorsed or authorized by Cardone Ventures, or that the services are otherwise affiliated with Cardone Ventures, when such is not the case.

130.   Cardone Ventures is informed and believes, and on that basis, alleges that Defendants have derived unlawful gains and profits from their infringing use of the Infringing Marks.

131.   The goodwill of Cardone Ventures' business under the ULTIMATE HUMAN ANALYSIS Marks is of great value, and Cardone Ventures will suffer irreparable harm should Defendants' trademark infringement be allowed to continue to the detriment of the trade reputation

and goodwill of Cardone Ventures for which damage Cardone Ventures cannot be adequately compensated at law.

132.    Cardone Ventures has no control over the nature and quality of the goods and services offered by Defendants under the Infringing Marks. Any failure, neglect, or default of Defendants in providing the Infringing Goods & Services will reflect adversely on Cardone Ventures. Thus, the value of the ULTIMATE HUMAN ANALYSIS Marks is subject to damage by an entity Cardone Ventures cannot control.

133.    Unless enjoined by this Court from so doing, Defendants will continue to engage in their acts of trademark infringement, unfair competition, and false representation and designations, to the irreparable damage and injury of Cardone Ventures.

134.    Cardone Ventures has no adequate remedy at law.

135.    Upon information and belief, Defendants have engaged in acts of unfair competition and false representation and designations, with knowledge of Cardone Ventures' exclusive rights in and to the ULTIMATE HUMAN ANALYSIS Marks in connection with the Plaintiffs' Services, and Defendants continue in such acts of intentional unfair competition and false representation and designations, thus entitling Cardone Ventures to an award of treble its actual damages or Defendants' profits, plus attorneys' fees and costs in bringing and maintaining this action, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117.

**THIRD CLAIM FOR RELIEF**
**Cancellation of U.S. Trademark Registration No. 7522205**
**for Priority and Likelihood of Confusion Under Lanham Act 15 U.S.C. § 1064**

136.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

137.    Plaintiffs assert that Defendants' U.S. Trademark Registration No. 7522205 should be cancelled under Section 14 of the Lanham Act, 15 U.S.C. § 1064, because Cardone Ventures

has senior trademark rights in the ULTIMATE HUMAN ANALYSIS Marks and consequently there is no question of priority of rights, as such priority belongs to Cardone Ventures.

138.    A petition to cancel a registration may be filed "by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register . . . (1) [w]ithin five years from the date of the registration of the mark."  15 U.S.C. § 1064.

139.    Under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it (d) [c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive."

140.    On October 27, 2023, Ultimate Human filed a use-based application under Section 1(a) of the Lanham Act, 15 U.S.C. § 1051(a), with the USPTO for registration of the mark THE ULTIMATE HUMAN for "entertainment services, namely, providing audio and video podcasts in the field of longevity and anti-aging" in Class 41 ("Defendants' Registration Services"), with a claimed date of first use and first use in commerce of October 17, 2023.  The application was assigned Serial No. 98243495, and registered on the Principal Register on October 1, 2024 as Registration No. 7522205 (the Registration already defined above).

141.    Defendants' THE ULTIMATE HUMAN Mark in the Registration so resembles Cardone Ventures' ULTIMATE HUMAN ANALYSIS Marks in appearance, sound, meaning, and commercial impression that the use and registration thereof is likely to cause confusion, mistake, and deception as to the source or origin of the Defendants' Registration Services in violation of

Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d), and will injure and damage Cardone Ventures and the goodwill and reputation symbolized by the ULTIMATE HUMAN ANALYSIS Marks.

142.    The Defendants' Registration Services specified in the Registration are closely related to the Plaintiffs' Services offered under the ULTIMATE HUMAN ANALYSIS Marks that the public is likely to be confused, deceived, and to assume erroneously that the Defendants' Registration Services are those of Cardone Ventures or that Defendants are in some way connected with, licensed, or sponsored by or affiliated with Cardone Ventures, all to Cardone Ventures' irreparable damage.

143.    Likelihood of confusion is enhanced by the fact that Defendants' THE ULTIMATE HUMAN Mark and Cardone Ventures' ULTIMATE HUMAN ANALYSIS Marks are identical or confusingly similar, such that the public is likely to be confused, deceived, and to assume erroneously that Defendants' Registration Services are those of Cardone Ventures or that Defendants are in some way connected with, licensed, or sponsored by or affiliated with Cardone Ventures, all to Cardone Ventures' irreparable damage.

144.    Likelihood of confusion is further enhanced by the fact that the Parties market or will likely market their goods and services in the same or similar channels of trade and to the same or similar classes of customers.

145.    Likelihood of confusion is additionally enhanced by the fact that the ULTIMATE HUMAN ANALYSIS Marks are strong, well-known, and entitled to a broad scope of protection.

146.    Defendants are not affiliated or connected with Cardone Ventures and have not been endorsed or sponsored by Cardone Ventures, nor has Cardone Ventures approved any of the goods or services offered or sold by Defendants under THE ULTIMATE HUMAN Mark.

147.    Defendants have never sought or obtained Cardone Ventures' permission to use THE ULTIMATE HUMAN Mark, nor has Cardone Ventures agreed to allow Defendants to use THE ULTIMATE HUMAN Mark.

148.    Cardone Ventures' federal registration for the ULTIMATE HUMAN ANALYSIS Marks provides, at the very least, constructive notice to Defendants of Cardone Ventures' rights in and to the ULTIMATE HUMAN ANALYSIS Marks.

149.    By virtue of the foregoing, Cardone Ventures believes that it is now and will be damages by the continued presence on the Principal Register of Registration No. 7522205 for THE ULTIMATE HUMAN Mark. If Defendants are permitted to maintain Registration No. 7522205 and retain such rights as conferred under the Principal Register of the Lanham Act, Defendants will retain an unlawfully gained advantage to which Defendants are not entitled under the Lanham Act, to the detriment and harm of Cardone Ventures.

**FOURTH CLAIM FOR RELIEF**
**Trademark Infringement and Unfair Competition**
**<u>Under the State of Florida Common Law</u>**

150.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

151.    Cardone Ventures owns and enjoys all right, title, and interest in and to the ULTIMATE HUMAN ANALYSIS Marks, including common law rights in the State of Florida. Cardone Ventures is the exclusive owner of the common law trademark rights in the ULTIMATE HUMAN ANALYSIS Marks. No license or authorization has been granted to Defendants to use any of these marks, or variations thereon.

152.    Without Cardone Ventures' authorization, Defendants are using the Infringing Marks in connection with their business providing the Infringing Goods & Services.

153.    Defendants, with full knowledge of the public awareness and value of the ULTIMATE HUMAN ANALYSIS Marks, have traded off and misappropriated the reputation and valuable goodwill of the ULTIMATE HUMAN ANALYSIS Marks in the State of Florida and acted in a manner that has created and will continue to create a likelihood of confusion and mistake as to the source of the Infringing Goods & Services.  By falsely suggesting a connection with or sponsorship by Cardone Ventures, Defendants' acts are likely to lead the public to believe mistakenly that Infringing Goods & Services are in some way associated with, connected with, or sponsored by Cardone Ventures, to the detriment of Cardone Ventures, and without Cardone Ventures' authorization. Defendants' activities constitute unfair competition, misappropriation of the goodwill of Cardone Ventures, and palming off.

154.    Defendants' Infringing Marks are identical to or substantially indistinguishable from the ULTIMATE HUMAN ANALYSIS Marks in appearance, sound, meaning, and commercial impression that the use and registration thereof is likely to cause confusion, mistake, and deception as to the source or origin of Infringing Goods & Services, and will injure and damage Cardone Ventures and the goodwill and reputation symbolized by the ULTIMATE HUMAN ANALYSIS Marks.

155.    The Infringing Goods & Services offered under the Infringing Marks are identical or so related to the Plaintiffs' Services offered under the ULTIMATE HUMAN ANALYSIS Marks by Cardone Ventures that the public is likely to be confused, deceived, and to assume erroneously that the Infringing Goods & Services are those of Cardone Ventures or that Defendants are in some way connected with, licensed, or sponsored by or affiliated with Cardone Ventures, all to Cardone Ventures' irreparable damage.

156.    Likelihood of confusion is enhanced by the fact that the ULTIMATE HUMAN ANALYSIS Marks are strong, well-known, and entitled to a broad scope of protection.

157.    Likelihood of confusion is also enhanced by the fact that Defendants' Infringing Marks are visually and phonetically identical or substantially indistinguishable from the ULTIMATE HUMAN ANALYSIS Marks, and Infringing Goods & Services are identical or closely related to the Plaintiffs' Services.

158.    Likelihood of confusion is further enhanced by the fact that Defendants' Infringing Marks and the ULTIMATE HUMAN ANALYSIS Mark both prominently incorporate the identical, key components "ULTIMATE HUMAN" and "ULTIMATE," Defendants' Infringing Marks are wholly encompassed by the ULTIMATE HUMAN ANALYSIS Marks, and the Infringing Goods & Services are identical or closely related to the Plaintiffs' Services. Specifically, the Infringing Marks have the same dominant components ULTIMATE HUMAN and ULTIMATE and for the same or closely related goods and services.

159.    Likelihood of confusion is even further enhanced by the fact that Cardone Ventures and Defendants market and will likely market their services in the same or similar channels of trade. Defendants use the Infringing Marks on their website, social media, and in other manners typical in the trade in connection with offering and rendering the Infringing Goods & Services.

160.    Defendants' offering of the Infringing Goods & Services under the Infringing Marks has caused and, unless enjoined, will likely continue to cause consumers and the public to conclude mistakenly that the Infringing Goods & Services originate from or are sponsored, authorized, or endorsed by Cardone Ventures.

161.    Upon information and belief, Defendants intentionally adopted and use the Infringing Marks so as to create consumer confusion and trade off Cardone Ventures' reputation and goodwill under the ULTIMATE HUMAN ANALYSIS Marks.

162.    Defendants' acts therefore constitute trademark infringement and unfair competition in violation of the common law of the State of Florida.

163.    Upon information and belief, Defendants have profited from their unlawful actions and have been unjustly enriched to Cardone Ventures' detriment and have caused loss, injury, and damage to Cardone Ventures, its goodwill, and the ULTIMATE HUMAN ANALYSIS Marks in an amount as yet unknown but to be proven at trial.

164.    Unless enjoined by this Court from so doing, Defendants will continue their conduct of passing off and engaging in acts of infringement and unfair competition and cause irreparable damage and injury to Cardone Ventures' goodwill, business identity and reputation, as well as the public's detriment. Cardone Ventures is therefore entitled to a permanent injunction enjoining and restraining Defendants from use of the Infringing Marks or any other mark that is confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks.

165.    Cardone Ventures has been irreparably harmed and, unless enjoined by this Court, will continue to be irreparably harmed by Defendants' rendering of the Infringing Goods & Services under the Infringing Marks.

166.    Cardone Ventures has no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Breach of the Brecka Agreement – IJS and Brecka
### Governed by Florida law

167.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

168.     IJS and Brecka materially breached the Brecka Agreement by: (a) Failing to devote substantially all of their time to 10X Health; (b) Failing to materially abide by 10X Health's policies, practices, procedures, and rules; and (c) Engaging in any other business, profession, or occupation for compensation which would conflict or interfere with the performance of services to 10X Health.

169.     As a result of these material breaches, 10X Health and Cardone Ventures have been damaged.

WHEREFORE, Plaintiffs demands judgment against IJS and Brecka for compensatory damages, interest, attorneys' fees, and costs.

### SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duty – IJS and Brecka
### Governed by the Agreement and Florida law

170.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

171.     At all relevant times during the term of the Brecka Agreement or the Restricted Period, IJS and Brecka owed fiduciary duties to 10X Health as referenced in Section 3.2.1 of the Brecka Agreement.

172.     IJS and Brecka similarly owed fiduciary duties to 10X Health under Florida law.

173.     IJS and Brecka breached the fiduciary duty of loyalty by: (a) engaging in businesses competitive with 10X Health and Cardone Ventures, including by creating and operating Ultimate Human, a competing entity, during the term of Agreement with 10X Health and during the Restricted Period; (b) misappropriating 10X Health resources; (c) engaging in self-dealing; and (d) otherwise prioritizing their interests over 10X Health and Cardone Ventures.

174.    IJS and Brecka's actions are the direct and proximate cause of 10X Health and Cardone Ventures' damages.

175.    As an Affiliate, Cardone Ventures is a third-party beneficiary of the Agreement.

176.    At no time did 10X Health or Cardone Ventures ever approve or condone these actions.

177.    As a result of IJS and Brecka's breaches of fiduciary duty, they, along with Ultimate Human, LLC have obtained substantial profits.

WHEREFORE, Plaintiffs demand judgment against IJS, Brecka, and Ultimate Human for compensatory damages, interest, disgorgement of all profits obtained from any Competing Business, including Ultimate Human, LLC, attorneys' fees, and costs.

## SEVENTH CLAIM FOR RELIEF
### Injunctive Relief (Non-Competition Provision) – IJS and Brecka
### <u>Governed by the Agreement and Florida law</u>

178.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

179.    Section 4.2 of the Agreement states as follows:

4.2    **<u>Non-Competition</u>**. Service Provider and Executive shall not, during the Term or the Restricted Period (as defined below), own, manage, operate, join, control, be employed by, participate in, consult, or be connected with any business, individual, partner, firm, corporation, or other entity that competes with Company or any of its Affiliates in the following products and services anywhere in the United States (the "Competing Business"):

(i)    consulting services to any person or entity that provides, offers, or develops anti-aging, hormone therapy, human rejuvenation, or cosmetic services that are the same as or similar to services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials;

(ii)    the manufacture or supply of anti-aging, hormone therapy, or cosmetic products; or

(iii) any anti-aging, hormone therapy, vitamin supplement, or rejuvenation products or services that are the same as or similar to products and services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials.

180. The "Restricted Period" means either the one-(1)-year period following the termination of this Agreement if this Agreement is terminated by Company without Cause or by Service Provider with Good Reason, or, in all other cases, the two-(2)-year period following the termination of this Agreement. Because 10X Health terminated the Agreement with Cause, Brecka cannot compete with 10X Health or its Affiliates, including Cardone Ventures, until the two-year-period expires on November 5, 2026.

181. Brecka created Ultimate Human, a competing business, during his employment with 10X Health and has continued to operate Ultimate Human during the Restricted Period.

182. Brecka utilized 10X Health's resources to develop Ultimate Human in violation of the Agreement.

183. Based on Section 4.2 of the Agreement, 10X Health has a substantial likelihood of success on the merits.

184. Brecka's creation and operation of Ultimate Human has caused irreparable injury to 10X Health and will continue to do so unless injunctive relief is granted.

185. The threatened injury to 10X Health outweighs any damage the proposed injunction may cause Brecka.

186. Injunctive relief is required to enforce the terms of the Agreement the parties voluntarily executed with the assistance of counsel.

187. The injunctive relief sought in this action will not be adverse to the public interest.

WHEREFORE, 10X Health demands temporary and permanent injunctive relief:

(a) maintaining the status quo and preventing Brecka from engaging in competition in

   violation of the Agreement,

(b) enforcing the terms of the Agreement, and

(c) awarding such other relief as the Court deems just and proper.

### EIGHTH CLAIM FOR RELIEF
**Breach of the Workinger Agreement – Turning Point and Workinger**
**<u>Governed by Florida law</u>**

188.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 95 as if fully set forth herein.

189.    Turning Point and Workinger materially breached the Workinger Agreement by:

(a) Failing to devote substantially all of their time to 10X Health; (b) Failing to materially abide

by 10X Health's policies, practices, procedures, and rules; and (c) Engaging in any other business,

profession, or occupation for compensation which would conflict or interfere with the performance

of services to 10X Health.

190.    As a result of these material breaches, 10X Health and Cardone Ventures have been

damaged.

WHEREFORE, 10X Health and Cardone Ventures demand judgment against IJS and

Brecka for compensatory damages, interest, attorneys' fees, and costs.

### NINTH CLAIM FOR RELIEF
**Breach of Fiduciary Duty – Turning Point and Workinger**
**<u>Governed by the Agreement and Florida law</u>**

191.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 95 as if fully set forth herein.

192.    At all relevant times during the term of the Workinger Agreement or the Restricted Period, Turning Point and Workinger owed fiduciary duties to 10X Health as referenced in Section 3.2.1 of the Workinger Agreement.

193.    Turning Point and Workinger similarly owed fiduciary duties to 10X Health under Florida law.

194.    Turning Point and Workinger breached the fiduciary duty of loyalty by: (a) engaging in businesses competitive with 10X Health and Cardone Ventures, including by participated in creating and operating Ultimate Human, a competing entity, during the term of Agreement with 10X Health and during the Restricted Period; (b) misappropriating 10X Health resources; (c) engaging in self-dealing; and (d) otherwise prioritizing their interests over 10X Health and Cardone Ventures.

195.    Turning Point and Workinger's actions are the direct and proximate cause of 10X Health's damages.

196.    As an Affiliate, Cardone Ventures is a third-party beneficiary of the Agreement.

197.    At no time did 10X Health or Cardone Ventures ever approve or condone these actions.

198.    As a result of Turning Point and Workinger's breaches of fiduciary duty, they, along with Ultimate Human, LLC have obtained substantial profits.

WHEREFORE, Plaintiffs demand judgment against Turning Point, Workinger, and Ultimate Human for compensatory damages, interest, disgorgement of all profits obtained from any Competing Business, including Ultimate Human, LLC, attorneys' fees, and costs.

**TENTH CLAIM FOR RELIEF**
**Injunctive Relief (Non-Competition Provision) – Turning Point and Workinger**
**<u>Governed by the Agreement and Florida law</u>**

199.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

200.     Section 4.2 of the Agreement states as follows:

> 4.2     **Non-Competition**. Service Provider and Executive shall not, during the Term or the Restricted Period (as defined below), own, manage, operate, join, control, be employed by, participate in, consult, or be connected with any business, individual, partner, firm, corporation, or other entity that competes with Company or any of its Affiliates in the following products and services anywhere in the United States (the "Competing Business"):

> (iv)     consulting services to any person or entity that provides, offers, or develops anti-aging, hormone therapy, human rejuvenation, or cosmetic services that are the same as or similar to services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials;

> (v)     the manufacture or supply of anti-aging, hormone therapy, or cosmetic products; or

> (vi)     any anti-aging, hormone therapy, vitamin supplement, or rejuvenation products or services that are the same as or similar to products and services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials.

201.     The "Restricted Period" means either the one-(1)-year period following the termination of this Agreement if this Agreement is terminated by Company without Cause or by Service Provider with Good Reason, or, in all other cases, the two-(2)-year period following the termination of this Agreement. The one-year period expires on November 5, 2025.

202.     Workinger has promoted the Ultimate Human brand and otherwise assisted Brecka with Ultimate Human, a competing business, during the Restricted Period.

203.     Based on Section 4.2 of the Agreement, 10X Health has a substantial likelihood of success on the merits.

204.     Ultimate Human has caused irreparable injury to 10X Health and will continue to do so unless injunctive relief is granted.

205.     The threatened injury to 10X Health outweighs any damage the proposed injunction may cause Workinger.

206.     Injunctive relief is required to enforce the terms of the Agreement the parties voluntarily executed with the assistance of counsel.

207.     The injunctive relief sought in this action will not be adverse to the public interest.

WHEREFORE, 10X Health demands temporary and permanent injunctive relief:

(a) maintaining the status quo and preventing Workinger from engaging in competition in violation of the Agreement,

(b) enforcing the terms of the Agreement, and

(c) awarding such other relief as the Court deems just and proper.

## ELEVENTH CLAIM FOR RELIEF
### Declaratory Relief

208.     Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

209.     In 2023, Brecka and Workinger approached Brandon Dawson, CEO of 10X Health, indicating that they required a loan in order to satisfy certain tax obligations.

210.     On August 18, 2023, 10X Health entered into a Loan Agreement and a Pledge Agreement with Brecka's entity, IJS. IJS borrowed the total amount committed under the loan, in the amount of $1,161,111.11.

211.     Pursuant to the IJS Loan Agreement:

(a) interest accrued on the outstanding balance of the loan amount at the annual rate of 5.00%, compounded monthly;

(b) the entire outstanding balance of the loan amount and all accrued interest is due and payable on the Maturity Date; and

(c) the "Maturity Date" is defined as March 15, 2025. However, if the IJS Executive Services Agreement was terminated for any reason, the termination date of the Services Agreement became the Maturity Date.

212.    The IJS Executive Services Agreement terminated on November 5, 2024.

213.    On November 14, 2024, 10X Health notified IJS of its failure to timely repay the balance of the loan amount and accrued interest. As of that date, the total amount due (loan amount plus accrued interest) was $1,211,436.46.

214.    Pursuant to the IJS Loan Agreement:

(a) the borrower's failure to make any payment within 5 days of notice constituted an Event of Default;

(b) if any Event of Default occurred, all amounts due under the Loan Agreement become immediately due and payable, without notice; and

(c) 10X Health has all rights under the Pledge Agreement and in law, in equity, or otherwise.

215.    Pursuant to the IJS Pledge Agreement:

(a) All membership interests held by IJS or Turning Point, as the case may be, in 10X Health were "Pledged Collateral" for the loan;

(b) Upon the occurrence of an Event of Default, all of the pledgor's "voting and other consensual rights pertaining to the Pledged Collateral" cease, and 10X Health, as the secured party, has the sole right to exercise rights with respect to the Pledged Collateral as if it were "the outright owner thereof"; and

(c)   IJS must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment, waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement.

216.   To date, IJS has failed to make any payment with respect to its Loan Agreement.

217.   As such, an Event of Default occurred with respect to IJS.

218.   On November 22, 2024, 10X Health notified IJS of the adoption of an Amended and Restated Operating Agreement for 10X Health.

WHEREFORE, 10X Health seeks the following declaration against IJS:

(a)   That IJS is in Default of the Loan Agreement;

(b)   That IJS must repay the Loan with interest in full;

(c)   As a result of IJS' Default, 10X Health was and is entitled to vote the Pledged Collateral at all material times; and

(d)   IJS must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment, waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement.

## TWELFTH CLAIM FOR RELIEF
### Declaratory Relief

219.   Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 95 as if fully set forth herein.

220.   In 2023, Brecka and Workinger approached Brandon Dawson, CEO of 10X Health, indicating that they required a loan in order to satisfy certain tax obligations.

221.    On August 18, 2023, 10X Health entered into a Loan Agreement and a Pledge Agreement with Workinger's entity, Turning Point. Turning Point borrowed the total amount committed under the loan, in the amount of $738,888.89.

222.    Pursuant to the IJS Loan Agreement:

(a) interest accrued on the outstanding balance of the loan amount at the annual rate of 5.00%, compounded monthly;

(b) the entire outstanding balance of the loan amount and all accrued interest is due and payable on the Maturity Date; and

(c) the "Maturity Date" is defined as March 15, 2025. However, if the IJS Executive Services Agreement was terminated for any reason, the termination date of the Services Agreement became the Maturity Date.

223.    The Turning Point Executive Services Agreement terminated on November 5, 2024.

224.    On November 14, 2024, 10X Health notified Turning Point of its failure to timely repay the balance of the loan amount and accrued interest. As of that date, the total amount due (loan amount plus accrued interest) was $770,811.06.

225.    Pursuant to the Turning Point Loan Agreement:

(a) the borrower's failure to make any payment within 5 days of notice constituted an Event of Default;

(b) if any Event of Default occurred, all amounts due under the Loan Agreement become immediately due and payable, without notice; and

(c) 10X Health has all rights under the Pledge Agreement and in law, in equity, or otherwise.

226.     Pursuant to the Turning Point Pledge Agreement:

(a)  All membership interests held by IJS or Turning Point, as the case may be, in 10X Health were "Pledged Collateral" for the loan;

(b)  Upon the occurrence of an Event of Default, all of the pledgor's "voting and other consensual rights pertaining to the Pledged Collateral" cease, and 10X Health, as the secured party, has the sole right to exercise rights with respect to the Pledged Collateral as if it were "the outright owner thereof"; and

(c)  Turning Point must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment, waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement.

227.     To date, Turning Point has failed to make any payment with respect to its Loan Agreement.

228.     As such, an Event of Default occurred with respect to Turning Point.

229.     On November 22, 2024, 10X Health notified Turning Point of the adoption of an Amended and Restated Operating Agreement for 10X Health.

WHEREFORE, 10X Health seeks the following declaration against Turning Point:

(a)      That Turning Point is in Default of the Loan Agreement;

(b)      That Turning Point must repay the Loan with interest in full;

(c)      As a result of Turning Point's Default, 10X Health was and is entitled to vote the Pledged Collateral at all material times; and

(d)      Turning Point must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment,

waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement.

## **ALLEGATION OF DAMAGES COMMON TO ALL CLAIMS FOR RELIEF**

230.    Plaintiffs repeat each and every allegation contained in Paragraphs 1 through 229 above, as if set forth herein in full.

231.    Plaintiffs suffered, are suffering, and will continue to suffer irreparable harm and damage as a result of Defendants' wrongful conduct. Defendants will, unless restrained and enjoined, continue to act in the unlawful manner complained of herein, all to the irreparable damage of the business and reputation of Plaintiffs. Plaintiffs remedy at law is not adequate to compensate it for the injuries suffered and threatened.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray the Court:

1.    Enter a judgment against Defendants that Defendants have committed and are committing acts of trademark infringement in violation of the rights of Cardone Ventures under 15 U.S.C. § 1114;

2.    Enter a judgment against Defendants that Defendants have willfully infringed the registered trademark rights of Cardone Ventures in and to the ULTIMATE HUMAN ANALYSIS Marks under 15 U.S.C. § 1114;

3.    Enter a judgment against Defendants that Defendants have committed and are committing acts of unfair competition, false designation of origin, false and misleading description of fact, and false and misleading representation in violation of the rights of Cardone Ventures under 15 U.S.C. §1125(a);

4.      Enter a judgment designating this action an exceptional case entitling Cardone Ventures to an award of its reasonable attorneys' fees incurred as a result of this action, pursuant to 15 U.S.C. § 1117;

5.      Enter a judgment against Defendants that Defendants have engaged in trademark infringement and unfair competition in violation of the State of Florida common law;

6.      Enter a judgment against Defendants that Cardone Ventures' ULTIMATE HUMAN ANALYSIS Marks have priority over Defendants' U.S. Trademark Registration No. 7522205, and that Defendants' U.S. Trademark Registration No. 7522205 is likely to cause confusion with Cardone Ventures' ULTIMATE HUMAN ANALYSIS Marks;

7.      Enter a judgment cancelling U.S. Trademark Registration No. 7522205 in its entirety;

8.      Issue preliminary and permanent injunctive relief against Defendants, and that Defendants, their parents, subsidiaries, affiliates, officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all other persons and entities acting in concert and participation with Defendants, be enjoined and restrained from:

      i.      using, advertising, marketing, promoting, displaying, exhibiting and/or rendering any goods or services under the Infringing Marks, the terms "ULTIMATE HUMAN" or "ULTIMATE," or any other trademark or name confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks, and from using any of Cardone Ventures' accounts to which Defendants have or had access;

      ii.      imitating, copying, or making any other infringing use of the ULTIMATE HUMAN ANALYSIS Marks and the Infringing Marks, and any other mark

now or hereafter confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks;

iii.    manufacturing, assembling, producing, distributing, offering of distribution, circulating, selling, offering for sale, advertising, importing, promoting, or displaying any simulation, reproduction, counterfeit, copy, or colorable imitation of the ULTIMATE HUMAN ANALYSIS Marks, the Infringing Marks, or any mark confusingly similar thereto;

iv.    using any false designation of origin or false description or statement which can or is likely to lead the trade or public or individuals erroneously to believe that any good or service has been provided, produced, distributed, offered for distribution, circulation, sold, offered for sale, imported, advertised, promoted, displayed, licensed, sponsored, approved, or authorized by or for Cardone Ventures, when such is not true in fact;

v.    using the names, logos, or other variations thereof of the ULTIMATE HUMAN ANALYSIS Marks or the Infringing Marks in any of Defendants' trade or corporate names;

vi.    engaging in any other activity constituting an infringement of the ULTIMATE HUMAN ANALYSIS Marks, or the rights of Cardone Ventures in, or right to use or to exploit the ULTIMATE HUMAN ANALYSIS Marks; and

vii.    assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs (i) through (vii) above;

9.     Ordering   Defendants   to   cease   all   use   of   the   domain   name   <the ultimatehuman.com> and to transfer the domain name to Cardone Ventures, and further ordering Defendants not to use any domain name likely to cause confusion with the ULTIMATE HUMAN ANALYSIS Marks;

10.    Order Defendants to change the corporate name of Ultimate Human to a name that does not incorporate the terms "ULTIMATE HUMAN" or "ULTIMATE;"

11.    Order Defendants, at their own expense, to recall all marketing, promotional and advertising materials that bear or incorporate the Infringing Marks, or any mark confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks, which have been distributed, sold, or shipped by Defendants or on their behalf, and to reimburse all customers from which said materials are recalled;

12.    Order Defendants to destroy all labels, signs, prints, packages, molds, plates, dies, wrappers, receptacles, and advertisements in their possession or under their control, bearing the Infringing Marks, and/or any simulation, reproduction, copy, or colorable imitation thereof, and all plates, molds, matrices, and any other means of making the same;

13.    Order Defendants to publish notice to all customers or members the trade who may have seen or heard of Defendants' use of the Infringing Marks, which notice shall disclaim any connection with Cardone Ventures and shall advise them of the Court's injunction order and of Defendants' discontinuance from all use of the Infringing Marks;

14.    Order Defendants to file with this Court and to serve upon Cardone Ventures within thirty (30) days after the entry of injunctive relief against Defendants in this action, a written report by Defendants, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction; and

15.     Order Defendants to pay the costs of corrective advertising;

16.     Order Defendants to hold in trust, as constructive trustee for the benefit of Cardone Ventures, their profits obtained from their provision of Infringing Goods & Services offered for sale under the Infringing Marks;

17.     Order Defendants never to file for any trademark for or incorporating the Infringing Marks, the ULTIMATE HUMAN ANALYSIS Marks, or any other designation that is confusingly similar to the ULTIMATE HUMAN ANALYSIS Marks, and to expressly abandon U.S. Trademark Application Serial Nos. 98446729, 98446831, 98447105, 98581097, 98581099, 98638497, 98670744, and 98670752;

18.     Order a full and complete accounting by Defendants to Cardone Ventures of all amounts due and owing to Cardone Ventures as a result of Defendants' illegal activities, including any profits gained from the Infringing Goods & Services rendered under the Infringing Marks;

19.     Order Defendants to pay the general, special, actual, and statutory damages to Cardone Ventures, including for injury to Cardone Ventures' business reputation and goodwill, and all other damages arising out of Defendants' acts of infringement and unfair competition, in an amount yet to be determined, as follows:

    i.    Cardone Ventures' damages or Defendants' profits, whichever is greater, trebled pursuant to 15 U.S.C. § 1117(a) for Defendants' willful violation of the federally registered trademarks of Cardone Ventures; and

    ii.    Cardone Ventures' damages or Defendants' profits pursuant to the State of Florida State common law.

20.     Order Defendants to pay to Cardone Ventures both the costs of this action and reasonable attorneys' fees, plus applicable interest, incurred by Cardone Ventures in prosecuting this action pursuant to 15 U.S.C. § 1117(a);

21.     Enter a judgment against IJS, Brecka, Turning Point, and Workinger for compensatory damages, interest, disgorgement of all profits obtained from any Competing Business, including Ultimate Human, LLC, attorneys' fees, and costs.

22.     Enjoin Defendants from engaging in competition in violation of the Agreement;

23.     Enter a judgment against IJS, Brecka, Turning Point, and Workinger for their breaches of fiduciary duty to 10X Health;

24.     Enter a declaration against IJS that it (a) is in Default of the Loan Agreement; (b) must repay the Loan Agreement with interest in full; and (c) as a result of IJS' Default, 10X Health was and is entitled to vote the Pledged Collateral at all material times; and (d) that IJS must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment, waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement;

25.     Enter a declaration against Turning Point that it (a) is in Default of the Loan Agreement; (b) must repay the Loan Agreement with interest in full; and (c) as a result of Turning Point's Default, 10X Health was and is entitled to vote the Pledged Collateral at all material times; and (d) that Turning Point must pay all reasonable costs, disbursements, and expenses incurred by 10X Health in connection with the negotiation, execution, administration, amendment, waiver, enforcement, or collection of the Pledge Agreement, with such amount constituting obligations secured under the Pledge Agreement; and

26.   Award such other and further relief as the Court deems just and proper.

Dated: December 26, 2024                    BUCHANAN INGERSOLL & ROONEY PC

By:   /s/ Miranda L. Soto
Miranda L. Soto (Fla. Bar No. 637963)
miranda.soto@bipc.com
Daniel R. Lazaro (Fla. Bar No. 99021)
dan.lazaro@bipc.com
Victoria Bechtold Kush (Fla. Bar No. 59144)
victoria.kush@bipc.com
Masiel Pelegrino Almon (Fla. Bar No. 1011409)
masiel.almon@bipc.com
2 South Biscayne Blvd., Suite 1500
Miami, FL 33131
Tel: (305) 347-4080
Fax: (305) 347-4089

John M. Nading* (DC Bar No. 981625)
john.nading@bipc.com
*pro hac vice motion forthcoming
1700 K Street, NW, Suite 300
Washington, DC 20006-3807
Tel: 202-452-7900
Fax: 202-452-7989

*Attorneys for Plaintiffs Cardone Ventures, LLC and 10X Health Ventures LLC*