# Exhibit 1

## SECOND AMENDED AND RESTATED EXECUTIVE
## SERVICES AGREEMENT

**PARTIES:**   10X Health Ventures LLC, a Delaware limited liability company ("**Company**")

**And**   IJS Presentations, LLC, a Florida limited liability company ("**Service Provider**") and Gary Brecka ("**Executive**")

### RECITALS

WHEREAS that certain Asset Purchase Agreement by and among Company; Streamline Medical Group Naples LLC; Streamline Wellness, LLC; Executive; and Cicely Workinger ("**Workinger**") was executed on September 16, 2021 (the "**Purchase Agreement**");

WHEREAS the Purchase Agreement contemplates that Executive shall enter into a services agreement with Company;

WHEREAS Executive is the sole member of Service Provider and has sole and absolute control over Service Provider;

WHEREAS Service Provider has been issued 11,000 Class A Units of membership interest in Company, of which 1,334 are subject to redemption through December 31, 2023 under the Conditional Unit Redemption Agreement dated September 16, 2021;

WHEREAS Company and Executive entered into that certain Executive Services Agreement on September 16, 2021, as amended and restated by that certain First Amended and Restated Executive Services Agreement, dated February 28, 2022, by and among the Company, Service Provider, and Executive (the "**Executive Services Agreement**"), and Company, Service Provider, and Executive desire to amend and restate the Executive Services Agreement;

WHEREAS Service Provider's attorney delivered a Good Reason Notice to Company, dated May 31, 2023 (the "**Good Reason Notice**"), and the parties have agreed to resolve their differences by entering into this Second Amended and Restated Executive Services Agreement (the "**Agreement**");

WHEREAS, upon full execution by all parties hereto, the Good Reason Notice shall be deemed withdrawn;

WHEREAS Company paid Service Provider $120,000 on or about May 30, 2023 (the "**Interim Payment**"); and

WHEREAS Company, Service Provider, and Executive (each individually referred to herein as a "**Party**" and together as the "**Parties**") hereby enter into this Agreement with an effective date of March 1, 2023 (the "**Effective Date**");

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the promises and mutual covenants set forth herein, and intending to be bound hereby, the Parties agree as follows:

1

# ARTICLE 1
## ENGAGEMENT; DUTIES; TERM

**1.1** **Engagement.** Company engages Service Provider to provide the services set forth herein and appoints Executive to the office of Executive Vice President – Chief Human Biologist (the "**Office**"). Service Provider accepts the engagement, and Executive accepts the appointment. Service Provider and Executive shall report directly to the Chief Executive Officer of Company ("**CEO**").

**1.2** **Services; Duties.** Service Provider and Executive shall devote substantially all of their time to Company and to fulfilling the duties assigned to them hereunder which shall include such duties for Company that are consistent with Executive's title, experience, and education as may from time to time be assigned to them by the CEO. In addition, the CEO may assign Service Provider and Executive to provide services to one or more of Company's Affiliates upon reasonable terms and conditions that are acceptable to Service Provider and Executive.

   **1.2.1** Service Provider and Executive agree to materially abide by Company's policies, practices, procedures, and rules of which they are notified, to the extent the policies, practices, procedures, and rules are not inconsistent with this Agreement, in which case the provisions of this Agreement prevail.

   **1.2.2** During the Term (as defined below), Service Provider and Executive shall devote substantially all of their business time and attention to the performance of the duties hereunder and will not engage in any other business, profession, or occupation for compensation or otherwise which would conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the CEO. For the avoidance of doubt, neither Service Provider nor Executive shall have any arrangements or agreements to receive compensation for its or his services, sponsorships, or promotions with or from any other person or business, except as expressly permitted herein. Notwithstanding anything to the contrary herein, Executive, and only Executive, may, as long as there is no conflict or interference with the performance of Service Provider's or Executive's duties under this Section 1.2: (i) author and have published any book(s) on topics at the discretion of Executive and retain all advances, compensation or royalties derived therefrom provided that any book(s) covering any topics related to Company business shall include forewords by Grant Cardone and/or Brandon Dawson and said book(s) shall reference and promote Company's name and direct readers to all applicable Company websites and social media accounts; (ii) accept and give speeches on any topics provided that (a) 100% of the speaking fee and any other compensation arising therefrom shall be paid to Company, (b) all expenses incurred by Executive shall be reimbursed to Executive from the fees and other compensation received by Company, (c) 50% of the profit from the speeches that Executive sources and books without any marketing, advertising, or promotion by Company, Cardone Ventures, LLC, Brandon Dawson, or Grant Cardone shall be paid to Service Provider and Company shall retain the other 50% (Company shall retain 100% of all speaking fees and other compensation arising from speeches by Executive that Company books for Executive or that directly result from Company's, Cardone Ventures, LLC's, Brandon Dawson's, or Grant Cardone's marketing, advertising, or promotion of Executive as a speaker), and (d) Executive where appropriate shall reference and promote Company, its websites, and social media accounts; and (iii) engage in any podcasts or shows and retain all compensation (less any expenses paid by Company) derived from podcasts or shows that Executive sources and books without any marketing, advertising, or promotion by Company, Cardone Ventures, LLC, Brandon Dawson, or Grant Cardone (Company shall retain 100% of all compensation derived from Executive's appearances on or contributions to any podcasts or shows that Company books for Executive or that directly result from Company's, Cardone Ventures, LLC's, Brandon Dawson's, or Grant

Cardone's marketing, advertising, or promotion of Executive as talent or as an expert, and Executive where appropriate shall reference and promote Company, its websites, and social media accounts.

   1.2.3 During the Term, Service Provider and Executive shall be responsible for the transfer of know-how, memorialization, instruction, and training of Company officers and employees and shall cooperate in creating systems of know-how with Company officers and employees.

   1.2.4 Nothing in this Agreement shall prohibit Executive, and only Executive, from pursuing and participating in charitable or community activities, passive investments, or business activities wholly unrelated to the anti-aging and hormone optimization field so long as such activities are not competitive with Company or do not materially detract Executive from performing his duties as described above.

 **1.3** **Work Location.** Service Provider and Executive's primary work location ("**Executive's Location**") shall be as agreed upon in writing between Service Provider, Executive, and the Company. Executive shall be required to travel on Company business at the CEO's direction during the Term, at Company's expense pursuant to Section 2.3.

 **1.4** **Term.** The term of this Agreement shall begin on the Effective Date and shall expire on September 15, 2024 (the "**Initial Term**") unless this Agreement is terminated earlier pursuant to Article 3. Following the Initial Term, this Agreement shall continue indefinitely on an at-will basis until any Party terminates it in accordance with Article 3. The Initial Term and any period thereafter during which this Agreement is in full force and effect are collectively the "**Term**."

 **1.5** **Affiliate.** The term "**Affiliate**" means (i) with respect to a corporation, limited liability company, partnership, trust, or other legal entity (the "**Subject Entity**"), any other person directly or indirectly controlling, controlled by, or under common control with the Subject Entity, where "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract, or otherwise, and the terms "**controlling**" and "**controlled**" shall have meanings correlative to the foregoing; and (ii) with respect to any natural person, any other legal entity that directly or indirectly through one or more intermediaries is controlled by such natural person, and any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, or sibling of that natural person or his or her spouse, including adoptive relationships.

ARTICLE 2
COMPENSATION

 **2.1** **Fee.** For all services rendered under this Agreement, Company shall pay Service Provider a fee at the annual rate of $240,000.00 USD in the form of guaranteed payments to a partner within the meaning of Subchapter K of the Internal Revenue Code ("**Code**"). Service Provider's fee at the rate referenced herein or as may be increased from time to time, shall be referred to hereunder as the "**Fee**." Company shall pay the Fee to Service Provider in monthly installments of $20,000, prorated for any partial months during the Term. Company shall pay each monthly installment in arrears on or before the 5th day of the month immediately following the month in which the Fee is earned. All compensation provided to Service Provider under this Agreement, whether by way of the Fee, Incentive Pay (as defined below), severance, or otherwise, shall be reduced by such amounts as are required to be withheld by law. However, Service Provider shall be solely responsible for reporting all of its

compensation received under this Agreement to the Internal Revenue Service as a self-employed individual who is a member of a limited liability company that is taxed as a partnership under the Code. Notwithstanding the foregoing, all Fees accrued between the Effective Date and the date hereof shall be paid to Service Provider upon the execution of this Agreement to the extent they were not previously paid, which for the period from the Effective Date through July 31, 2023 is $37,500.

**2.2** **Incentive Pay.** Pursuant to this Section 2.2, Company shall pay Service Provider additional compensation to encourage and reward Service Provider and Executive for selling Company's products and services (the "**Incentive Pay**"). Company's obligation to pay Service Provider any Incentive Pay for a particular month is conditioned upon Company's receipt of at least $4,000,000 in revenue in the month at issue. If Company does not receive at least $4,000,000 in revenue, Company shall not be obligated to pay Service Provider any Incentive Pay under this Section 2.2 for that month. Company may adjust the minimum revenue requirements described above in this Section, annually, with Executive's consent, which may not be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, all Incentive Pay accrued between the Effective Date and the date hereof shall be paid to Service Provider upon the execution of this Agreement to the extent it was not previously paid, and the minimum revenue requirement set forth in this Section shall not apply for the period of time from the Effective Date to the date hereof. Half of the Interim Payment that was made to Service Provider—*i.e.*, $60,000—is deemed to be Incentive Pay that was previously paid for all purposes under this Agreement.

**2.2.1** **Revenue Override.** During the Term, Company shall pay Service Provider a percentage of all revenues that Company receives and retains, subject to Sections 2.2.2 through 2.2.6 and further subject to quarterly adjustments pursuant to this Section, up to a maximum of $225,000 per month and $2,700,000 per year pursuant to the table in this Section. Revenue on which Service Provider earns Incentive Pay under Sections 2.2.2 to 2.2.6 is excluded from this calculation. After the end of each calendar quarter during the Term, Company shall review the revenue overrides paid to Service Provider in that quarter and calculate the revenue override on a quarterly basis by (i) taking the average—*i.e.*, the arithmetic mean—of the monthly revenue in the quarter at issue, and (ii) determining the revenue override on the average monthly revenue under the table in this Section (the "**Average Revenue Override**"), and (iii) multiplying the Average Revenue Override by three (the "**Adjusted Quarterly Revenue Override**"). If the Adjusted Quarterly Revenue Override is greater than the sum of the monthly revenue overrides that were paid to Service Provider for the quarter at issue, Company shall promptly pay the difference to Service Provider. If the Adjusted Quarterly Revenue Override is less than the sum of the monthly revenue overrides that were paid to Service Provider for the quarter at issue, the difference will be credited to Company and future payments by Company to Service Provider will be offset by the difference.

| Monthly Revenue Ranges | | Additional Incremental Override Percentage | Revenue Override Marginal Percentage | Total Revenue Override Potential (Minimum - Maximum) | |
| --- | --- | --- | --- | --- | --- |
| $0.00 | $3,999,999.99 | 0.000% | 0.000% | $0 | $0 |
| $4,000,000.00 | $5,000,000.00 | 0.000% | 0.900% | $36,000 | $45,000 |
| $5,000,000.01 | $6,000,000.00 | 0.125% | 1.025% | $45,000 | $55,250 |
| $6,000,000.01 | $7,000,000.00 | 0.250% | 1.275% | $55,250 | $68,000 |
| $7,000,000.01 | $8,000,000.00 | 0.375% | 1.650% | $68,000 | $84,500 |

4

12224046-4

| | | | | | |
|---|---|---|---|---|---|
| $8,000,000.01 | $9,000,000.00 | 0.500% | 2.150% | $84,500 | $106,000 |
| $9,000,000.01 | $10,000,000.00 | 0.625% | 2.775% | $106,000 | $133,750 |
| $10,000,000.01 | $11,000,000.00 | 0.750% | 3.525% | $133,750 | $169,000 |
| $11,000,000.01 | $12,000,000.00 | 0.875% | 4.400% | $169,000 | $213,000 |
| $12,000,000.01 | $13,000,000.00 | 1.000% | 5.400% | $213,000 | $225,000 |

**2.2.2** **Profit Share on SuperHuman Protocol and Equipment Sales.** During the Term, Company shall pay Service Provider ten percent (10%) of the net profit that Company makes and retains on Executive's sales of SuperHuman Protocol, cold plunges, PEMF mats, hypermax oxygen units, and red light panels as Executive's sales are tracked in Company's books and records and as Company's net profit is attributed to sales of SuperHuman Protocol, cold plunges, PEMF mats, hypermax oxygen units, and red light panels. Net profit means gross revenues minus all expenses, including, without limitation, the Fee and all other costs, expenses, and charges (excluding any Incentive Pay). To the extent Service Provider is entitled to profit sharing in this Section, the profit sharing in this Section replaces and is not in addition to the revenue override under Section 2.2.1. Neither Service Provider nor Executive shall earn any revenue override on their sales of SuperHuman Protocol.

**2.2.3** **Revenue Override on Methylation Tests.** During the Term, Company shall pay Service Provider ten percent (10%) of the revenue that Company receives and retains from each customer's first online purchase of a methylation test by or through Executive's sales link, which has the following URL: 10Xhealthtest.com. To the extent Service Provider is entitled to the revenue override in this Section, the revenue override in this Section replaces and is not in addition to the revenue override under Section 2.2.1.

**2.2.4** **Revenue Override on Supplements.** During the Term, Company shall pay Service Provider ten percent (10%) of the revenue that Company receives and retains from each customer's first online purchase of dietary supplements by or through Executive's sales link, which is at 10Xhealthtest.com or a different URL that is agreed upon by the Parties. To the extent Service Provider is entitled to the revenue override in this Section, the revenue override in this Section replaces and is not in addition to the revenue override under Section 2.2.1.

**2.2.5** **Revenue Override on Affiliate Sales.** During the Term, Company shall pay Service Provider five percent (5%) of the revenue that Company receives and retains from Company's affiliates for sales originating from Executive's hyperlinks that will be agreed upon by Company, Executive, and Company's affiliates. To the extent Service Provider is entitled to the revenue override in this Section, the revenue override in this Section replaces and is not in addition to the revenue override under Section 2.2.1.

**2.2.6** **Revenue Override on Lab Reviews.** During the Term, Company shall pay Service Provider fifty percent (50%) of the revenue that Company receives and retains from each lab review that Executive personally delivers, up to a payment to Service Provider of $5,000 per lab review. To the extent Service Provider is entitled to the revenue override in this Section, the revenue override in this Section replaces and is not in addition to the revenue override under Section 2.2.1.

12224046-4

        **2.2.7**    **Conditions and Payment of Incentive Pay.** For each month during the Term, Company shall pay Service Provider the Incentive Pay earned in that month within thirty (30) days of the end of the month. Notwithstanding the foregoing, Service Provider must be engaged by Company under this Agreement for Service Provider to be eligible for the Incentive Pay, and Service Provider shall not earn or receive Incentive Pay after Service Provider's engagement with Company has terminated; provided, however, Service Provider shall be entitled to any Incentive Pay earned up to the last day prior to termination of the engagement. Upon reasonable notice from Service Provider, during the Term and for a period of ninety (90) days following the termination of this Agreement, Company shall afford Service Provider access during normal business hours to the financial and similar books, records, reports, and documents of Company, and shall permit Service Provider to examine such documents and make copies thereof, in order to confirm Service Provider's Incentive Pay. Notwithstanding the foregoing, if Service Provider's Incentive Pay cannot be confirmed within the 90-day period following the termination of this Agreement because of the state or condition of Company's books, records, reports, and documents, Service Provider shall continue to have access to Company's books, records, reports, and documents until they are in a state or condition that allows the confirmation of Service Provider's Incentive Pay.

        **2.2.8**    **Clawback, Offset or Return Provisions.** Any amounts payable under this Agreement are subject to any reasonable policy (whether in existence as of the Effective Date or later adopted) established by Company providing for clawback, recovery, or offset against prospective Incentive Pay under Section 2.2 of amounts that were paid to Service Provider in error or with respect to revenues that were refunded to a client. Incentive Pay from refunded revenues shall offset future Incentive Pay and shall not be clawed back by Company. Company will provide prior written notice to Service Provider and Executive at least thirty (30) days prior to clawback, recovery, or offset against prospective Incentive Pay and any such determination for clawback, recovery, or offset shall be in good faith and pursuant to applicable law or regulation.

    **2.3**    **Business Expenses.** Company shall, in accordance with, and to the extent of, its written policies in effect from time to time, reimburse all ordinary and necessary business expenses reasonably incurred by Service Provider or Executive in performing its or his duties under this Agreement, provided that Service Provider and Executive account for such expenses to Company in the manner prescribed by Company. All reimbursements under this Section 2.3 shall be administered in accordance with the requirements of Section 409A (defined below).

    **2.4**    **Rest and Relaxation.** Executive shall be entitled to an unspecified number of days of rest and relaxation (vacation, personal time, etc.) each calendar year. Days of rest and relaxation shall not roll over and shall not be paid out if unused.

## ARTICLE 3
## TERMINATION

    **3.1**    **Termination.** This Agreement shall be terminated only by written notice specifying the section of the Agreement pursuant to which the Agreement is being terminated. Upon termination for any reason, Company shall pay Service Provider all amount of the Fee earned through the date of termination and any Incentive Pay that has been earned on or prior to the date of termination but has not yet been paid, and Company shall reimburse business expenses as provided under this Agreement. Notwithstanding termination of Service Provider's engagement for any reason, Company's obligations under Article 5 shall continue in effect according to its terms.

    **3.2**    **Termination by Company.** Company may terminate this Agreement immediately with

6

or without Cause as that term is defined herein, upon notice to Service Provider.

        **3.2.1** **Definition of Cause.** "**Cause**" shall mean only: (i) Service Provider's or Executive's failure to materially perform its or his duties (other than any such failure resulting from incapacity due to physical or mental illness); (ii) Service Provider's or Executive's failure to materially comply with any reasonable, valid and legal directive of Company; (iii) Service Provider's or Executive's engagement in dishonesty, illegal conduct or misconduct resulting in material and substantial economic harm to Company; (iv) Service Provider's or Executive's embezzlement, misappropriation, or fraud, whether or not related to Service Provider's engagement with Company or Executive's appointment to the Office; (v) Service Provider's or Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent); (vi) Service Provider's or Executive's material breach of any agreement with Company resulting in material harm to Company; (vii) any material breach by Service Provider or Executive of this Agreement or any other agreement with Company; (viii) a knowing and material violation of a material requirement of a Company policy or code of conduct; (ix) Service Provider's or Executive's breach of a fiduciary duty towards Company resulting in material and substantial economic harm to Company; or (x) any partial or complete change in ownership or control of Service Provider.

        Except for Sections 3.2.1(iii), (iv), and (v), termination for Cause requires Company to provide written notice ("**For Cause Notice**") to Executive describing in detail the condition(s) giving rise to potential termination for Cause within sixty (60) days of the date on which such condition first occurred or the date on which the CEO has actual knowledge of such condition, whichever is later.

        Upon Executive's receipt of such For Cause Notice, Service Provider and Executive have thirty (30) days in which to cure the condition(s) as set forth in the For Cause Notice.

        In the event Service Provider and Executive do not cure the condition(s) as set forth in the For Cause Notice within the 30-day cure period, Company's termination must occur within fifteen (15) days following the end of the cure period. In the event Company does not terminate within that 15-day period, Company shall be deemed to have consented to such condition(s).

        If Company gives Executive two (2) For Cause Notices in any twelve-(12)-month period, Company shall not be required to give a For Cause Notice upon the occurrence of any additional Cause within the same twelve-(12)-month period, and Company may terminate this Agreement immediately for Cause upon the occurrence of any such additional Cause. In addition, no For Cause Notice shall be given upon the occurrence of a Cause under Section 3.2.1(iii), (iv), or (v), and Company may terminate this Agreement immediately for Cause with respect to Section 3.2.1(iii), (iv), or (v).

        **3.2.2** **Payment Upon Termination for Cause.** If Company terminates this Agreement for Cause, then except as set forth in Sections 2.1, 2.2, and 3.1 or as otherwise required by law, Company shall not owe Service Provider or Executive anything further under this Agreement.

        **3.2.3** **Payment Upon Termination Without Cause.** If Company terminates this Agreement without Cause during the Initial Term, then contingent upon Service Provider's and Executive's execution and delivery to Company (within the reasonable time required by Company but not less than twenty-one (21) days) of a full release of all claims substantially in the form of

Schedule 1 hereto (the "**Release**"), which Company shall deliver to Executive within five (5) days after the termination date, with no revocation by Service Provider or Executive having occurred in the event the Release contains a revocation provision, Company shall pay Service Provider a severance payment equal to twelve (12) months of Service Provider's then-current Fee and the Incentive Pay paid pursuant to Section 2.2 for the trailing twelve (12) months. Company shall pay the severance payment due pursuant to this Section 3.2.3 in twelve (12) equal monthly installments, beginning one month after the termination date. If Company terminates this Agreement without Cause, Company shall be released from any and all further obligations under this Agreement, except as set forth in Sections 2.1, 2.2, and 3.1, and as otherwise set forth in this Section 3.2.3 with respect to payment of severance (if applicable), and additionally, Service Provider shall be entitled to any remaining Class A Units under the Conditional Unit Redemption Agreement. If Company terminates this Agreement without Cause after the Initial Term ends, Company shall not owe any severance payment under this Section 3.2.3.

  **3.3**  **Termination by Service Provider.** Service Provider and Executive may terminate this Agreement with or without Good Reason, as defined below, at any time, upon notice to Company.

    **3.3.1**  **Good Reason Definition.** "**Good Reason**" means the occurrence of any of the following events without Service Provider or Executive consent:

    (i)  Requiring Executive to be based more than 10 miles from Executive's Location;

    (ii)  A material reduction in Service Provider's Fee or a material change to the computation of the Incentive Pay that disadvantages Service Provider without the consent of Service Provider or Executive;

    (iii)  A material reduction in the duties and responsibilities assigned to Service Provider or the Executive by Company; or

    (iv)  The failure to nominate Executive for election to the board of directors of Company or its successor when the equity of Company or its successor becomes listed on a national stock exchange, and the failure to use its best efforts to have Executive elected and re-elected, as applicable, to the board of directors; *provided, however*, neither Company nor its successor shall have any obligation to nominate Executive for election to the board of directors if this Agreement is terminated.

  Termination for Good Reason requires the Service Provider or Executive to provide written notice ("**Good Reason Notice**") to Company describing in detail the condition(s) giving rise to Good Reason within sixty (60) days of the date on which such condition first occurred.

  Upon Company's receipt of such Good Reason Notice, Company has thirty (30) days in which to cure the condition(s) as set forth in the Good Reason Notice.

  In the event Company does not cure the condition(s) as set forth in the Good Reason Notice within the 30-day cure period, Service Provider and Executive's termination of this Agreement must occur within fifteen (15) days following the end of the cure period. In the event Service Provider does not terminate within that 15-day period, Service Provider and Executive shall be deemed to have consented to such condition(s).

    **3.3.2**  **Payment Upon Termination For Good Reason.** In the event Service

8

12224046-4

Provider or Executive terminates this Agreement for Good Reason during the Initial Term, then contingent upon Service Provider's and Executive's execution and delivery to Company (within the reasonable time required by Company but not less than twenty-one (21) days) of a full release of all claims substantially in the form of the Release, which Company shall deliver to Executive within five (5) days after the termination date, with no revocation by Service Provider or Executive having occurred in the event the Release contains a revocation provision, Company shall pay Service Provider a severance payment equal to twelve (12) months of Service Provider's then-current Fee and the Incentive Pay paid pursuant to Section 2.2 for the trailing twelve (12) months. Company shall pay the severance payment due pursuant to this Section 3.3.2 in twelve (12) equal monthly installments, beginning one month after the termination date. If Service Provider terminates this Agreement for Good Reason, Company shall be released from any and all further obligations under this Agreement, except as set forth in Sections 2.1, 2.2, and 3.1, and as otherwise set forth in this Section 3.3.2 with respect to payment of severance (if applicable), and additionally, Service Provider shall be entitled to any remaining Class A Units under the Conditional Unit Redemption Agreement. If Service Provider or Executive terminates this Agreement for Good Reason after the Initial Term ends, Company shall not owe any severance payment under this Section 3.3.2.

        **3.3.3**    **Payment Upon Termination Without Good Reason.** If Service Provider terminates this Agreement without Good Reason, Company shall be released from any and all further obligations under this Agreement, except as set forth in Sections 2.1, 2.2, and 3.1 or as otherwise required by law.

**3.4**    **Termination in the Event of Death or Disability.**

        **3.4.1**    This Agreement, Service Provider's engagement, and Executive's appointment shall terminate immediately in the event of Executive's death. In the event of termination due to death, Company shall be released from any and all further obligations under this Agreement, except as set forth in Sections 2.2 and 3.1 and as required by law. Company shall pay amounts owed upon termination due to Executive's death in accordance with state law.

        **3.4.2**    Company may terminate this Agreement and Service Provider's engagement in the event of Executive's Disability. "**Disability**" shall mean, as reasonably determined in Company's Manager's discretion, after consultation with a physician selected by the Manager, the inability of Executive to perform, with reasonable accommodation, if necessary, any essential function of Service Provider's services or the duties of the Office under this Agreement because of physical or mental incapacity for a period of one hundred twenty (120) consecutive days. Executive shall cooperate in any physical examination and shall produce such medical records as may assist the Manager in making a determination regarding Disability. In the event of termination due to Executive's Disability, Company shall be released from any and all further obligations under this Agreement, except as set forth in Sections 2.2 and 3.1 and as required by law.

### ARTICLE 4
### PROPRIETARY INFORMATION; NON-COMPETITION

**4.1**    **Proprietary Information.**

        **4.1.1**    For purposes of this Agreement, the term "**Proprietary Information**" includes any information acquired by Service Provider or Executive as a result of Service

Provider's engagement with Company or Executive's appointment to the Office that is not generally available in the industry. Without limiting the foregoing, Proprietary Information also includes all confidential information of and confidential matters relating to Company's and its Affiliates' business, Company and its Affiliates, or any information provided to Company by third parties in confidence. The restrictions contained herein shall not apply to Proprietary Information which: (i) is or becomes generally available to the public other than by unauthorized disclosure by Service Provider or Executive in violation of this Agreement or other obligation of confidentiality; (ii) Service Provider or Executive can prove by documentary evidence it or he already knew prior to its engagement by Company; or (iii) becomes available on a non-confidential basis from a third party not under an obligation to any person to keep such information confidential.

    **4.1.2**  Service Provider and Executive agree to keep secret and retain in confidence all Proprietary Information and not to use such information for Service Provider's benefit, Executive's benefit, or the benefit of others, except in connection with the business of Company. Service Provider and Executive shall not disclose Proprietary Information to any person or use Proprietary Information in any way except (i) as required or otherwise appropriate in the course of their duties to Company, (ii) to assist Company on Company matters, or (iii) if required by law or legal process.

    **4.1.3**  Service Provider and Executive understand that they shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (b) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Service Provider and Executive also understand that disclosure of trade secrets to attorneys, made under seal, or pursuant to court order is also protected in certain circumstances under 18 U.S. Code §1833, such as a retaliation lawsuit based on the reporting a suspected violation of law.

    **4.2**  **Non-Competition.** Service Provider and Executive shall not, during the Term or the Restricted Period (as defined below), own, manage, operate, join, control, be employed by, participate in, consult, or be connected with any business, individual, partner, firm, corporation, or other entity that competes with Company or any of its Affiliates in the following products and services anywhere in the United States (the "**Competing Business**"): (i) consulting services to any person or entity that provides, offers, or develops anti-aging, hormone therapy, human rejuvenation, or cosmetic services that are the same as or similar to services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials; (ii) the manufacture or supply of anti-aging, hormone therapy, or cosmetic products; or (iii) any anti-aging, hormone therapy, vitamin supplement, or rejuvenation products or services that are the same as or similar to products and services offered by Company or in development by Company during the Term as reflected in Company's contemporaneous documents and materials.

For the purposes of this Agreement, "**Restricted Period**" means either the one-(1)-year period following the termination of this Agreement if this Agreement is terminated by Company without Cause or by Service Provider with Good Reason, or, in all other cases, the two-(2)-year period following the termination of this Agreement.

    **4.3**  **Other Interests.** Notwithstanding anything herein to the contrary, nothing herein shall prohibit Executive from (i) owning not more than five percent (5%) of the outstanding stock of any publicly held corporation, or (ii) engaging in any activities described in Section 1.2.4 above.

10

12224046-4

      **4.4** **Non-Solicitation of Employees.** Service Provider and Executive will not, without Company's prior consent, which will not be unreasonably withheld or delayed, directly or indirectly, at any time during the period of Service Provider's engagement and for a period of two (2) years following the termination of the Term, disrupt, damage, impair, or interfere with, or attempt to disrupt, damage, impair, or interfere with Company's business by soliciting any employees to resign from their employment by Company, or disrupt, damage, impair, or interfere with, or attempt to disrupt, damage, impair, or interfere with the relationship between Company and any of its consultants, agents, independent contractors, or representatives. Service Provider and Executive acknowledge that this covenant is necessary to enable Company to maintain a stable workforce and remain in business.

      **4.5** **Non-Solicitation of Customers and Suppliers.** At any time during the period of Service Provider's engagement and during the Restricted Period, Service Provider and Executive will not solicit or induce, or attempt to solicit or induce, a Restricted Customer or Restricted Supplier (each, as defined below) to cease doing business with Company, or any of its Affiliates, or to do business with a Competing Business.

      For purposes of this Section 4.5, the term "**Restricted Customer**" means a customer of Company or any of its Affiliates at any time within the 12-month period prior to termination of Service Provider's engagement with Company. The term "**Restricted Supplier**" shall mean any supplier of Company or its Affiliates at any time within the 12-month period prior to termination of Service Provider's engagement with Company.

      **4.6** **Relief.** Service Provider and Executive acknowledge that the remedy at law available to Company for breach of any of Service Provider's or Executive's obligations under this Agreement would be inadequate. Service Provider and Executive therefore agree that, in addition to any other rights or remedies that Company may have at law or in equity, temporary and permanent injunctive relief may be granted in any proceeding which may be brought to enforce the provisions of Sections 4.1 through 4.5, inclusive, of this Agreement, without the necessity of proof of actual damage.

      **4.7** **Inventions and Patents.** Service Provider and Executive acknowledge that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work, other works of authorship, and mask work (whether or not including any confidential information), all registrations or applications related thereto, all other proprietary information, and all similar or related information (whether or not patentable) which directly relate to Company's or its Affiliates' actual or anticipated business, research and development, or existing or future products or services which are conceived, developed, or made by Service Provider or Executive (whether alone or jointly with others) while engaged by Company (collectively, "**Work Product**"), belong to Company, and Service Provider and Executive hereby irrevocably assign, and agree to irrevocably assign, all right, title, and interest in and to such Work Product (and all intellectual property rights embodied therein) to Company. Notwithstanding anything herein to the contrary, the assignment of Work Product in this Section 4.7 does not apply to discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work, and mask work, and all registrations or applications related thereto, ("**Executive's Work Product**") for which no equipment, supplies, facilities, or trade secret information of Company was used and which was developed entirely on Executive's own time, unless (i) Executive's Work Product relates (a) directly to Company's products or services for anti-aging, human rejuvenation, hormone therapy, vitamin supplementation, or cosmetic therapy, or (b) to Company's actual or demonstrably anticipated research or development, or (ii) Executive's Work Product results from any work performed by Service Provider or Executive for Company.

**4.8** **Purchase Agreement Covenants.** Service Provider and Executive acknowledge and understand that the covenants in this Article 4 are in addition to, and do not supersede or replace, the restrictive covenants applicable to Service Provider and Executive under the Purchase Agreement. The covenants in this Agreement and the Purchase Agreement are intended to be cumulative.

## ARTICLE 5
## INDEMNIFICATION; INSURANCE

**5.1** **Statutory Indemnification.** Company agrees that the rights, if any, to indemnification, advancement of expenses, and exculpation by Company in favor of Service Provider or Executive under Company's Certificate of Formation and the Operating Agreement, in each case as in effect on the Effective Date, shall not be modified by Company in a manner that is less advantageous to Service Provider or Executive when compared to such rights as of the Effective Date.

**5.2** **Insurance.** During the Term and for four (4) years thereafter, Company shall maintain in effect the policies of directors' and officers' liability insurance with respect to claims arising out of or relating to events which occurred during the Term.

**5.3** **Termination or Modification.** The obligations of Company under this Article 5 shall not be terminated or modified in such a manner as to adversely affect Service Provider or Executive without the consent of Service Provider and Executive.

## ARTICLE 6
## MISCELLANEOUS

**6.1** **Notices.** All notices, requests, and demands given to or made pursuant hereto shall, except as otherwise specified herein, be in writing and be delivered or mailed to such Party at the address set forth below:

If to Executive:

Gary Brecka
1188 Rainbow Drive
Naples, FL 34104

With a copy to:

Berger Singerman LLP
1450 Brickell Ave, Unit 1900
Miami, FL 33131
Attention: James Gassenheimer, Esq.

If to Service Provider:

IJS Presentations, LLC
893 Vanderbilt Beach Rd
Naples, FL 34108

If to Company:

10X Health Ventures LLC
108 Lakeland Ave
Dover, DE 19901
Attention: Chief Executive Officer

With a copy to:

10X Health Ventures LLC
18851 NE 29th Ave, Unit 1000
Aventura, FL 33180
Attention: Brandon Dawson

Either Party may change its address by notice to the other Party given in the manner set forth in this Section. Any notice, if mailed by properly addressed, postage prepaid, registered or certified mail, shall be deemed dispatched on the registered date or the date marked on the certified mail receipt, and shall be deemed received on the third business day thereafter or when it is actually received, whichever is sooner.

**6.2** **Governing Law and Jurisdiction; Dispute Resolution.** This Agreement shall be governed by the laws of the State of Florida, without regard to any conflict-of-law principles that would cause the laws of any other jurisdiction to apply. Any disputes arising under this Agreement shall be brought exclusively in a state or federal court of competent jurisdiction in Miami-Dade County, Florida ("**Selected Forum**"). The Parties hereby consent to the Selected Forum's exercise of personal jurisdiction over them in any action between the Parties arising from or relating to this Agreement.

**6.3** **Waiver.** A Party's failure to demand strict performance of any provision of this Agreement shall not constitute a waiver of any provision, term, covenant, or condition of this Agreement or of the right to demand strict performance in the future.

**6.4** **Successors and Assigns.** This Agreement shall be binding upon Service Provider and Executive and their respective successors, assignees, heirs, executors, administrators, or other legal representatives and may be assigned and enforced by Company and its successors and assigns. Service Provider and Executive may not assign this Agreement without express, written consent of Company.

**6.5** **Entire Agreement.** This Agreement (together with the Purchase Agreement, the Operating Agreement, the Conditional Unit Redemption Agreement, and the other documents delivered pursuant thereto) constitutes the entire agreement of Company, Service Provider, and Executive with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, whether written or not. This Agreement may only be modified or amended in a writing signed by the Parties hereto.

**6.6** **Severability and Enforcement.** The provisions of this Agreement are severable. If any provision of this Agreement or its application is held invalid, the invalidity shall not affect other obligations, provisions, or applications of this Agreement which can be given effect without the invalid obligations, provisions, or applications. If a court determines that any covenant in Article 4 of this Agreement is unenforceable because of the duration or scope of such provision, the court shall have the power to amend the scope or duration of such provision to the extent permitted by law, and in its amended form, the provision shall remain in full force and effect.

  **6.7** **Section 409A.**  It is intended that the payments and benefits under this Agreement comply with, or as applicable, constitute a short-term deferral or otherwise be exempt from, the provisions of Section 409A of the Internal Revenue Code, as amended, and the regulations and other guidance issued thereunder (together, "**Section 409A**"). Company shall administer and interpret this Agreement in a manner so that such payments and benefits comply with, or are otherwise exempt from, the provisions of Section 409A, provided that Company shall not be required to assume any increased economic burden in connection therewith and Company shall not be liable to Service Provider or Executive for any tax, interest, or penalties Service Provider or Executive may owe under Section 409A or other applicable law as a result of compensation paid under this Agreement. Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation or tax penalties under Section 409A, Service Provider and Executive shall not be considered to have terminated the engagement with Company for purposes of this Agreement and no payments shall be due to Service Provider or Executive under this Agreement providing for payment of amounts on termination of engagement unless Service Provider and Executive would be considered to have incurred a "separation from service" from Company within the meaning of Section 409A. To the extent required in order to avoid accelerated taxation or tax penalties under Section 409A, and to the extent Service Provider or Executive is a "specified employee" under 409A as of Service Provider's and Executive's separation from service, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to this Agreement that are considered deferred compensation under Section 409A during the six-month period immediately following the termination of this Agreement shall instead be paid on the first business day after the date that is six months following the termination of this Agreement (or upon death, if earlier). In addition, for purposes of this Agreement, each amount to be paid or benefit to be provided to Service Provider or Executive pursuant to this Agreement which constitutes deferred compensation subject to Section 409A shall be construed as a separate identified payment for purposes of Section 409A.

    [Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, each of the Parties has executed this Agreement.

| **Executive** | **10X Health Ventures LLC** |
|---|---|
| | By Cardone Ventures, LLC, its Manager |

*[signature]*

**Gary Brecka**

Date: 8/10/2023

*[signature]*
Brandon Dawson (Aug 16, 2023 22:10 EDT)

**Brandon Dawson**
**CEO**

Date: Aug 16, 2023

**IJS Presentations, LLC**

*[signature]*

**Gary Brecka**
**Sole Member**

Date: 8/10/2023

15

12224046-4

## Schedule 1

### Form of Release of Claims

This RELEASE ("Release") is signed and executed as of _____, 20__ by IJS Presentations, LLC ("Service Provider") and Gary Brecka ("Executive") for the benefit of 10X Health Ventures LLC ("Company").

In consideration of Company making certain post-engagement payments to Service Provider under Section 3.2.3 or 3.3.2 (the "Severance Payments") of the Second Amended and Restated Executive Services Agreement between Service Provider, Executive, and Company (the "Services Agreement"), Service Provider and Executive hereby agree as follows:

Release in Full of All Claims. In exchange for the consideration set forth herein, Service Provider and Executive, for each of them and each of their agents, attorneys, heirs, administrators, executors, assigns, and other representatives, and for anyone acting or claiming on its or his or their joint or several behalf, hereby release, waive, and forever discharge Company, its affiliates, and its and their officers, directors, successors, assigns, and other representatives and anyone acting on their joint or several behalf (the "Releasees"), from any and all known and unknown claims, causes of action, demands, damages, costs, expenses, liabilities, or other losses arising from Service Provider's engagement with Company, Executive's appointment to an office of the Company, or the termination thereof. By way of example only and without limiting the immediately preceding sentence, Service Provider and Executive agree that they are releasing, waiving, and discharging any and all claims against Company and the Releasees under (a) any federal, state, or local employment law or statute, including, but not limited to, Title VII of the Civil Rights Act(s) of 1964 and 1991, the Americans with Disabilities Act (ADA), Age Discrimination in Employment Act (ADEA), Older Worker Benefit Protection Act (OWBPA), Family and Medical Leave Act (FMLA), Worker Adjustment and Retraining Notification Act (WARN), Uniformed Services Employment and Reemployment Rights Act (USERRA), and applicable state employment law(s), and (b) any federal, state, or municipal law, statute, ordinance, or common law doctrine; provided, however, that Executive specifically does not release any claims to challenge the validity of this Release under the ADEA or any claims that Executive cannot waive by operation of law. Notwithstanding the foregoing, for the avoidance of doubt, Company acknowledges and agrees that this Release in no way alters Executive's rights, if any: (i) to any benefits to which he is entitled under any health or welfare benefit plan of Company in which he participated; (ii) any rights arising under Article V of the Services Agreement or any rights to insurance coverage for or indemnification against, third-party claims arising from Executive's service as an officer or director of Company; (iii) any rights under the Asset Purchase Agreement relating to the acquisition of the assets of Streamline Medical Group Naples LLC and Streamline Wellness, LLC; or (iv) any right to enforce payment of the severance under the Services Agreement. Service Provider and Executive understand that nothing in this Release limits their ability to file a charge or complaint with the Equal Employment Opportunity Commission, the Department of Labor, the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission, or any other federal, state, or local governmental agency or commission ("Government Agencies"). Service Provider and Executive further understand this Release does not limit their ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to Company. While this Release does not limit Executive's right to receive an award for information provided to a Government Agency, Service Provider and Executive understand and agree that, to the maximum extent permitted by law, they are otherwise waiving any and all rights they may have to individual relief based on any claims that they have released and any rights they have waived by signing

this Release.

Mutual Non-Disparagement. Service Provider and Executive agree that, except as permitted herein, they shall not talk about or otherwise communicate to any third parties in a malicious, disparaging, or defamatory manner regarding Company or its members, officers and directors. Company agrees that, except as permitted herein, Company or its members, officers and directors shall not talk about or otherwise communicate to any third parties in a malicious, disparaging, or defamatory manner regarding Service Provider or Executive.

ADEA/OWBPA Waiver & Acknowledgement. Insofar as this Release pertains to the release of Executive's claims, if any, under the Age Discrimination in Employment Act, Executive, pursuant to and in compliance with the rights afforded him under the Older Worker Benefit Protection Act: (a) is hereby advised to consult with an attorney before executing this Release; (b) is hereby afforded twenty-one (21) days to consider this Release; (c) may rescind this Release any time within the seven (7) day period following his execution of the Release; (d) is hereby advised that this Release shall not become effective or enforceable until the seven (7) day revocation period has expired; and (e) is hereby advised that he is not waiving claims that may arise after the date on which he executes the Release. If this Release is revoked within the revocation period, Company shall have no obligation to make the Severance Payments. If this Release is not revoked within the revocation period, this Release will be effective and enforceable on the date immediately following the last day of the seven (7) day revocation period. The offer to execute this Release in exchange for the Severance Payments shall remain open for twenty-one (21) days, after which time it shall be automatically withdrawn.

Voluntary Execution. Service Provider and Executive acknowledge that they are executing this Release voluntarily and of their own free will and that they fully understand and intend to be bound by the terms of this Release.

IN WITNESS WHEREOF, Service Provider and Executive hereby certify that they have read this Release in its entirety and voluntarily executed it in the presence of a competent witness, as of the date set forth under their signatures.

| **EXECUTIVE** | **SERVICE PROVIDER** |
|---|---|
| Print Name: | Print Name: _____<br>Title: _____ |
| Date | Date |
| Witness | |
| Date | |

12224046-4

# 20230816 G Brecka Second Amended and Restated Executive Services Agreement

Final Audit Report 2023-08-17

| | |
|---|---|
| Created: | 2023-08-17 |
| By: | Jeffrey Peterson (jeff.peterson@pnwblaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmP9cdBlcMPq2JvJUdytqNlc6R9OdvF0P |

## "20230816 G Brecka Second Amended and Restated Executive Services Agreement" History

- Document created by Jeffrey Peterson (jeff.peterson@pnwblaw.com)
  2023-08-17 - 2:08:22 AM GMT

- Document emailed to brandon@cardoneventures.com for signature
  2023-08-17 - 2:09:31 AM GMT

- Email viewed by brandon@cardoneventures.com
  2023-08-17 - 2:10:09 AM GMT

- Signer brandon@cardoneventures.com entered name at signing as Brandon Dawson
  2023-08-17 - 2:10:30 AM GMT

- Document e-signed by Brandon Dawson (brandon@cardoneventures.com)
  Signature Date: 2023-08-17 - 2:10:32 AM GMT - Time Source: server

- Agreement completed.
  2023-08-17 - 2:10:32 AM GMT

![Adobe Acrobat Sign]